Argued March 28; affirmed June 12; rehearing denied
September 11, 1945

## STATE *v.* DENNIS
(159 P. (2d) 838, 161 P. (2d) 670)

Before BELT, Chief Justice, and ROSSMAN, KELLY, BRAND and HAY, Associate Justices.

*Edwin D. Hicks* and *Paul M. Long,* both of Port-land (Thomas H. Tongue, III, of Portland, on the brief), for appellant.

*Thomas B. Handley,* Deputy District Attorney, of Portland (James R. Bain, District Attorney, of Portland, on the brief), for respondent.

## BRAND, J.

█ The first assignment of error relates to the denial of defendant's motion for a directed verdict. There was no eyewitness to the killing and the State's case, therefore, stands upon circumstantial evidence. The rules concerning the sufficiency of circumstantial evidence are well established in this jurisdiction, and the innumerable citations from other states were unnecessary. Those rules may be stated as follows: The direct evidence of eyewitnesses is not necessary for conviction. The fact that a crime has been committed (the corpus delicti), and that it was done by the defendant, may be lawfully established by circumstantial evidence alone. But such evidence must be satisfactory. Mere suspicion, or mere probability of guilt, is insufficient. The evidence must be of the most cogent and convincing nature. Each fact necessary to establish guilt must be proved to the satisfaction of the jury and beyond reasonable doubt. The evidence upon which the State relies for conviction must not merely coincide with, render probable, and be consistent with, the guilt of the accused, but it must be inconsistent with any reasonable theory of his innocence and incapable of explanation upon any other rational hypothesis than that of guilt. *State v. Williams,* 46 Or. 287, 80 P. 655; *State v. Weston,* 102 Or. 102, 201 P. 1083; *Oregon Box & Mfg. Co. v. Jones Lumber Co.,* 117 Or. 411, 244 P. 313; *State v. Clark,* 99 Or. 629, 196 P. 360; and *State v. Evans,* 143 Or. 603, 22 P. (2d) 496. If, under these rules, facts and circumstances are proven which satisfy the jury of the truth of each and every one of the material elements of the charge beyond a reasonable doubt, a verdict of guilty would be warranted. This does not mean that all of the testimony must be consistent with the guilt

of the defendant. The testimony may be conflicting, yet the facts proved may warrant a verdict of guilty upon circumstantial evidence alone.

■■ The question before this court, however, is not the same as that which was before the jury. We are not directly concerned with the weight of the evidence, nor with the conflicts in the testimony, nor with the credibility of the witnesses. It is our duty to determine if there was sufficient circumstantial evidence of guilt from which the jury, in the performance of its function as triers of the fact, could properly find a verdict of guilty. *State v. Rosser,* 162 Or. 293, 86 P. (2d) 441, 87 P. (2d) 783, 91 P. (2d) 295. We weigh and examine the evidence only to the extent necessary for the performance of this duty. Defendant's motion for a directed verdict is in the nature of a demurrer to the evidence which admits the truth of the evidence of guilt and all reasonable inferences therefrom. The sufficiency of the evidence, when tested by a motion for directed verdict, will be considered in the light of these principles, but we are not to be understood as assuming the function of the jury.

■ The statute provides that:

"An inference must be founded:

(1) On a fact legally proved: and,

(2) On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature." O. C. L. A. § 2-404.

Therefore, an inference cannot be founded on an inference. However, that rule upon which the defendant so strongly relies has been much misunderstood and

severely criticized. The rule was not intended, and must not be applied, to inhibit or prevent any of the logical inductive or deductive processes by which the mind arrives at reasoned conclusions from adequate data.

"The purpose of the rule is not to inhibit our inveterate reasoning processes; it is merely a means of testing logically the relevancy or sufficiency of evidence to prove a fact in dispute. It does not forbid judgments based on circumstantial evidence, for, as Mr. Justice McBride said in State v. Clark, 99 Or. 629, 666, 196 P. 360:

" 'One fact may give rise to a single inference, or it may give rise to several inferences, or a logical conclusion may be drawn from a multitude of detached circumstances so related to each other and to the fact to be proved that it would be illogical to assume that they could all exist coincidentally and the fact in dispute be nonexistent.'

"On the other hand, it is not permitted to assume a fact that has not been legally proved and on such an insecure foundation to build a conclusion. * * *." *McKay v. State Ind. Acc. Com.*, 161 Or. 191, 199, 87 P. (2d) 202.

We accept the foregoing principles which have been earnestly urged upon us by defendant, and now proceed to the consideration of the evidence.

On January 30, 1944, the lifeless body of Anna Belle McNallen was found lying face downward on the floor of apartment 36 of the Westwood Apartments, 1809 S. W. Sixth Avenue, in the city of Portland. The cause of death was manual strangulation. The defendant was the son-in-law of Mrs. McNallen. Burdette Dennis was the wife of defendant and the daughter of deceased.

We will first consider the evidence of express malice and motive. The trouble between the defendant

and the deceased grows directly out of the marital troubles of the defendant and his wife Burdette. Evidence relative to the marital situation was, therefore, necessarily received. Defendant and his wife were married in 1927. They were separated in August, 1943. The final separation occurred after a quarrel in the First National Bank in which Burdette slapped the defendant. The defendant testified:

"A. That was the end of us ever living together again, as far as I was concerned, never.

\* \* \*

"Q. You were going to go your way and she was going to go her way?

"A. I told her she might as well go her way, and me likewise. She wanted to go out and party and drink and stay out all night; she couldn't do it and live with me."

Burdette and her mother then moved to Mr. Peck's residence, but the defendant testified that he continued to see his wife once a week, or twice a week, or "maybe I would see her three times a week, including Sunday, when she didn't have to work."

In August, 1943, the defendant, in the presence of witness Grace Gossett, called the deceased an "old whore" and "old bitch." This occurred in the First National Bank. The defendant followed his wife after they had left the bank, and again told the witness that his wife and mother-in-law were "both whores." On January 1, 1944, the defendant told witness Grace Gossett that he and Burdette "would get along all right if it wasn't for the old woman, that she was breaking up his home."

To the witness Charles Gossett, husband of Grace, the defendant said of the deceased: "If he could get rid

of her, if she hadn't come down, they [referring to himself and wife] would be all right.''

In September, 1943, the defendant said to witness Mrs. Maude Waldo: "He wished the old bitch was dead, that if she was dead that he and Burdette could be living together." Mrs. Waldo testified:

"A. It was always the same conversation; it was always that he wanted Berdette to come back to him but that she wouldn't come back to him until—as long as her Mother was living * * *.''

On one occasion after the separation, defendant drove his wife and Mrs. Waldo to the Heidelberg Inn, near Beaverton. The witness Waldo testified:

"A. And on the ride home from the park he wanted to know if Berdette was going to come back and live with him and she says, 'No, Andy, I am not, and that is final,' and he says, 'If it wasn't for your God damned Mother we could be together.' She never said anything.''

Concerning the period from September into January, the same witness testified:

"Q. During any of those conversations would the defendant mention the deceased, his Mother-in-law?
"A. It was always that he was mentioning his Mother-in-law. That was all the conversation was ever about; it was never anything else.
"Q. And what would he say?
"A. He would want me to interfere; he wanted me to talk to Berdette and ask her if there wasn't some way of her getting rid of her Mother so that they could go back together, and wanted me to talk to Berdette and persuade her to get rid of her Mother in some way, and I didn't understand what he meant. I asked him if he wanted her to throw her out on the street. He said, 'Anything, just to get

rid of her.' That was the conversation at all times that he would ever talk to me.''

Mrs. Waldo testified that about two weeks before the murder, while waiting for Burdette to finish her work at the beauty shop, she and the defendant went out for coffee.

'' * * * and he repeated over and over, that is all he could talk about, he wished the old bitch was dead, and it was the old bitch all the time that was interfering with their life. I told him he should leave town and get it off of his mind.''

The witness Louis L. Peck, at whose house Burdette was living after the separation, testified concerning a statement of defendant relative to Mrs. McNallen:

''Q. And what was it that was said to you?
''A. Well, I am going to state in plain words. It was, 'I should kill the old bitch, and then Berdette and I would have happiness.' ''

Mrs. Peck, wife of Louis, testified that on December 12, 1943, the defendant was present in connection with the issuance of some insurance,

'' * * * and after the insurance was made out he says, 'I have got to be going. I have a date with Berdette,' in other words, Mrs. Dennis, and he says, 'If the old lady will let her get out,' and he says, 'I should kill the old bitch, and maybe Berdette and I could have—find happiness together.' ''

The truth or falsity of the foregoing testimony concerning the defendant's animus toward the deceased, and the existence of motive, depend on the credibility of witnesses. On the one hand we have the testimony of Mrs. Grace Gossett, Charles Gossett, Mrs. Maude Waldo, Louis L. Peck, and Mrs. Peck, who appear to be fair and impartial witnesses. On the other hand we have the unsupported testimony of the defendant

who explicitly denied the statements of each of the foregoing witnesses, and who testified in general that his relations with his mother-in-law were friendly and that he had never made any of the hostile remarks attributed to him. He also asserted that he did not want his wife to return to him and had never attempted to persuade Mrs. Waldo to intercede for him with Burdette. He testified that the deceased had never, in his presence, said or done anything that would lead to a separation between himself and his wife, and that they were always on friendly terms. On cross-examination, however, he admitted that he had told the officers that he had a little argument with deceased in the summer of 1943. A proper foundation having been laid, the official court reporter who had taken a statement of the defendant during examinations by the police testified that the defendant said that he did not go up to Mrs. McNallen's apartment because his wife said her mother didn't want to see him there, and that the defendant said further:

"* * *" My Mother-in-law didn't like me, I know that. My wife didn't have to tell me that, and she wouldn't let her Mother know—she told me that she did not even let her Mother know she was with me at night. When we were going to a show or going out to eat, she would meet me down at the shop. She said she didn't even let her Mother know she saw me at night."

The same witness, by way of impeachment, testified that when asked, "Had your mother-in-law broken your home up?" the defendant answered, "Well, she did to a certain extent, yes."

Upon this phase of the case, the jury as judges of the fact could have found that defendant and the deceased had quarrelled over his wife; that the defendant

believed that the deceased had broken up his home; that defendant was trying unsuccessfully to induce his wife to return to him; that he believed the deceased was preventing it; that he entertained hatred for her and believed the only way he could get his wife to return was by getting rid of the deceased.

By Mrs. Gossett we are informed that she had dinner with the deceased at the Westwood Apartments on December 25, 1943, her husband and daughter also being present. They departed at about 11:30 p. m., and at that time saw the defendant at the side entrance of the apartment house, "and when he saw us, we walked up by him, he left, turned, pulled his hat over his face and walked past us towards Sixth Avenue." Mr. Charles Gossett testified that the defendant "was trying to get in the side door, working the doorknob."

Witness Muriel Perry was employed on the day shift at Cowles' Tavern, Sixth and Harrison. She saw the defendant there on Friday afternoon, and again at about 3 p. m. on Saturday, January 29, the day of the murder. He was having a glass of beer and he was acting peculiarly. When the witness saw his picture in the paper, she "recognized him right away."

Mrs. Mabel Peterson was on the evening shift at Cowles' Tavern. She saw the defendant there at about 8 p. m., and served him beer. He had on a light hat and a dark overcoat. The defendant's overcoat, a dark bluish green, is in evidence, as is his hat, which was grey.

On Friday evening, January 28, Betty Lou Lloyd, who lives in Apartment 33 of the Westwood Apartments, entered the apartment house. The defendant was standing by the vestibule telephone. The witness opened the front door with her keys and when she went

in, the defendant "stuck his foot in the door," entered, and followed her upstairs. She saw the defendant again on Saturday evening, January 29, at about 6:30 or 7 p. m. "He was just lingering on the second floor stairway," she told Mrs. Burnside.

Mrs. Burnside was the manager of the Westwood Apartments. Prior to January 29, she had seen the defendant in the apartment house. Concerning January 29, the witness testified:

"A. Well, the first time I saw him that night he was in the hall; I just passed him going like he was going down. I spoke, and then later I saw him downstairs and I asked him if he was looking for a woman and he said he was. I asked him who and he said for Marie, or Marion, and I asked him the last name and he said it was Deisel, or Deizel, and I said, 'Well, we haven't anybody by that name.' Then he said it was in apartment 228, and I said, 'We haven't any apartment that number.' So he thanked me and went out very nicely.

"Q. And did you have any further conversation with him at that time?

"A. No, that was all.

"Q. And when did you see him again?

"A. Well, somewhere about eight or half past eight, I don't know the exact hour, he came in again and I told him he was in the wrong apartment again, so he went back out.

\* \* \*

"Q. Now the second time you saw him, did you see him enter?

"A. Yes, I saw him coming in the door the second time.

"Q. How did he come in? Describe what he did.

"A. He just opened the door and walked in. The way I happened to be there, one of the ladies told me the door wasn't locked and I went up to see about it, and he opened the door and came in, and

I told him he was in the wrong apartment, so he went out, and I looked to see why the door wouldn't lock.

"Q. Now, why wouldn't the door lock?

"A. Well, it had a little toothpick or a match stuck in the lock so it wouldn't let it work, and I took that out so it locked all right then."

The first time Mrs. Burnside saw the defendant on January 29 was at 7 p. m.

Lee Jolliffe, as was his custom, went to see his girl friend at her folks' apartment in the Westwood on January 29. He left the apartment at 10:30 p. m. to make an appointment with the men who drove him to work on the graveyard shift at the Albina shipyards. His appointment with them was for quarter of eleven. As he left the apartment house, the witness saw the defendant using the vestibule telephone. He testified:

"A. He was standing on the outside of the front door, using the phone.

"Q. And what was he doing?

"A. The only reason I noticed him, he had a handkerchief over it.

"Q. Had a handkerchief over what?

"A. The phone, the mouthpiece."

The witness was inside the door talking to Mrs. Burnside for about three minutes during the time the defendant remained at the telephone.

Mrs. Burnside also saw the defendant between 10 and 10:30 p. m. on January 29. On that occasion he was outside the front door talking on the telephone to Apartment 36. She testified:

"Q. Now going back just a minute, Mrs. Burnside, how did you know he called apartment 36?

"A. As I say, I went out in the entrance and looked. Whenever you call a number you punch the button in and it stays until some other number is called. Of course, I went out as soon as he left and looked and that is the number that was in, and I called Mrs. McNallen and asked her if anyone was talking, and she said yes, someone was talking to her but she didn't know who it was."

When the defendant finished telephoning, he took his handkerchief and wiped the mouthpiece and the receiver of the telephone.

Phyllis Cumley, aged 14, was employed as a waitress at the Southwest Sixth Avenue Ice Cream Parlor on Saturday night, January 29. Her place of employment is in the same block as the Westwood Apartments. She saw the defendant at 10:30 p. m., or shortly before. From her the defendant bought a "clear" bottle of Par-T-Pak Cola. On cross-examination she testified that she had identified the defendant in a line-up at the jail as the man to whom she had sold the cola.

Two witnesses, Mrs. Velma Colt and Mrs. Minnie E. Stockett, lived in the Frances Manor, closely adjacent to the Westwood Apartments. Both heard screams at 11:45 p. m. Both looked at the clock. Mrs. Colt heard a voice say, "Don't, Don't. Oh, you shot me," together with sobbing and a thud. The sobbing and screaming lasted from 20 minutes to half an hour.

Mrs. A. Leonard occupied Apartment 35 in the Westwood, adjoining the apartment of deceased. At about 11:30 p. m. she heard knocking on a door. She then heard a door close. She went back to sleep. She was awakened by screaming and then came "an awful scream and a thud." Witness "heard her holler-

ing, 'I'm dying.' " She heard a scream after the thud. The next day the witness reported the incident to Mrs. Burnside.

Allene Mitchell, aged 15, the young friend of witness Lee Jolliffe, lived in Apartment 26 immediately under the apartment of deceased. The two apartments are identical. She testified that Lee left at 10:30 p. m. Allene went to bed at about 11:30 p. m. She heard a commotion overhead. " * * * there was a woman yelled, 'Don't, don't,' some gasps, and then there was a thud on the floor." The gasps followed the thud. The gasping sound lasted about ten minutes. She then heard heavy footsteps above her which continued from 11:50 p. m. to 12:10 a. m. When Mrs. Gross, her step-grandmother, returned, Allene told her of the incident.

Minnie B. Gross lived in Apartment 26 with Mr. and Mrs. Mitchell and Allene Mitchell. On January 29, Mrs. Gross was working at Swan Island from 3:30 to 11:30 p. m. She arrived home at about 12:15 a. m. As she started up the steps toward the door of the apartment, she saw the defendant coming down the steps. The defendant had his right hand in his overcoat pocket and held onto the railing at his right with his left hand. He had on a dark overcoat and grey hat, which was pulled down over his eyes. There was "quite a bright light over the door." On examination by the defense, Mrs. Gross testified that she identified the defendant in a police line-up. The identification of the defendant by each of the above witnesses was positive and direct.

The defendant denied that he was ever in the Cowles' Tavern; denied that he purchased the Par-T-Pak Cola; denied being in the neighborhood of the Westwood Apartments on Christmas night; denied

ever being in Apartment 36, or any other apartment in that building at any time in his life. He testified that the last time he was in the vicinity of the Westwood was on January 26, 1944. He gave a detailed account of his activities and whereabouts for the entire day of January 29. We will follow his narrative from mid-afternoon on.

According to that narrative, he went by street car to Twenty-third and Lovejoy, in Portland, and to the Dunsmore Inn, where he had a beer. He is corroborated in this by Joseph Ferreira, who testified that they were together at 3 p. m., or a little before 3, and remained together for three-quarters of an hour, or an hour. Defendant returned by street car and went directly to his room in the Carlton Hotel where he remained "till it was getting dark." He then went down to the lobby for a few minutes, and then to the Puritan Restaurant near the hotel, where he ate. He returned to the hotel and sat in the lobby. Then he went upstairs and stayed for a long time. Later, he talked to a soldier in the lobby. In the course of conversation with the soldier, whom he did not know, he observed that it was 10:40 p. m., and, again, that it was 11:10 p. m., by the lobby clock. The soldier remained with him until 11:20 or 11:25 p. m. After the soldier left, the defendant went to the Chinaman's restaurant, in the same building as the hotel, and he had a ham and egg sandwich and a cup of coffee, and while in the restaurant, at about midnight, the Filipino bellboy who was employed at the hotel came in and they had a long conversation which the defendant repeated. Defendant then returned to the hotel and went to bed and did not get up until about 8:30 or 9:30 Sunday morning. Defendant admitted that since his arrest he had heard that the Filipino boy was not in the city, hav-

ing quit his job on February 5. On rebuttal, the State produced Adriano Hugo, the Filipino bellboy, who was brought back from Boise, Idaho, to testify. Hugo denied having seen, eaten with, or talked with the defendant at any time on the night of January 29. The hotel clerk denied having seen the defendant in the lobby on the fatal evening.

From the foregoing testimony, the jury as judges of the fact could have found that the defendant on and prior to January 29 frequented the Westwood Apartments in a clandestine manner, in short, that he was "lying in wait"; that prior to the murder, he attempted to destroy evidence of his presence at the apartment house by removing his fingerprints from the telephone; that at the time of the murder the defendant was in the Westwood Apartments when he swore he was not, and was not in the Carlton Hotel, or the Chinaman's restaurant, when he swore he was. They could have found that the defendant's attempted alibi was based on perjured testimony, without corroboration from any other witness, and the defendant having been willfully false in part of his testimony, could have been distrusted in all.

On Sunday, January 30, Mrs. Burnside entered Apartment 36 to investigate the reported disorders of the night before. She found Mrs. McNallen lying dead on the floor. The police were called at 2:54 p. m., January 30. They found the room in disorder. There was broken glass on the floor. There were torn portions of a Par-T-Pak Cola label. The electric lights were still burning. The body of Mrs. McNallen, clad only in a night gown and dressing gown, lay upon the floor, face down. There were blood smears on the front and shoulders of the dressing gown, and a

brownish smear from a cola beverage on the back of the gown. Photographs were taken showing the disordered condition of the room and the body of the deceased as first found by the officers. One photograph shows broken glass and portions of the Par-T-Pak label on the floor. The broken glass and the torn portions of the cola label are in evidence. The glass is colorless. There was a blood stain on the floor under the head of the deceased. Officer Snook, on cross-examination, thought it came from her mouth. Dr. Warren C. Hunter performed the autopsy. He found a bruise on the top of her head toward the back. Some hairs had been cut or broken off and there were slivers of glass on the scalp. There was some bleeding. There were bruises on the neck, which were exactly described by the witness. When the structures of the neck were removed in the course of the autopsy, Dr. Hunter found hemorrhage in the muscles and in the gullet. There were many little pinpoint and other hemorrhages on the forehead and upper part of the chest and shoulders, which indicates death by strangulation. There were other bruises on the nose, left cheek, chin, lips, right arm, left leg, and right knee. The doctor found bloody or blood stained mucus in the larger air passages of the bronchi and lower windpipe.

The officers first saw the defendant on Monday morning, January 31, at his room. They took his shirt, hat, overcoat, trousers, and suitcoat and delivered them to Dr. Joseph Beeman, Director of the Crime Detection Laboratory of the Department of State Police. Hair taken from the body of Mrs. McNallen by Dr. Hunter was submitted to Dr. Beeman for examination. Glass particles were found in the hair. Dr. Beeman also found hair in the defendant's left pants

cuff. Dr. Beeman took photomicrographs of the hair found on the defendant's trousers, the hair found on the particles of glass, and the hair found on a portion of the Par-T-Pak bottle. The photomicrographs of the three hairs, which magnifies each about 250 times, is in evidence. Lengthy expert testimony tends to indicate that the three hairs ''are of the same approximate size. Their pigment has the same general distribution and character, they are of the same color, that is, a dark brown with a reddish tinge to it, and we can't tell them apart by optical or any other methods. In other words, the hair from the pants cuff and the Par-T-Pak bottle is identical with the hair from Mrs. McNallen's head.''

The witness Beeman found a small spot of human blood on the left leg of defendant's trousers just above the knee. There was also a small smear of human blood on inside pocket of defendant's suit coat. On the defendant's right overcoat pocket the witness found smears of human blood and also two fragments of glass in the right outer pocket. There is detailed testimony as to the scientific process by which the stains were identified as human blood. The particles of glass taken from the right overcoat pocket were originally covered with blood, which was washed off. The glass is in evidence.

Dr. Harold C. Harrison is the Chief Chemist and Spectrologist for the State Geology Department. He qualified as an expert on glass, its manufacture, composition and chemical differences which exist between different kinds of glass. Dr. Beeman brought to the witness Harrison eleven samples of glass. Among the specimens was glass from a Par-T-Pak bottle, from a common type pyrex glass, from two Royal Crown

bottles, from one Coca Cola bottle and from one 7-Up bottle. Among the eleven samples submitted were the following: glass picked up by the officers on the floor of Apartment 36, a particle of the glass found in defendant's overcoat pocket, and a particle of glass taken from the hair on the head of Mrs. McNallen. Dr. Harrison gave an exhaustive explanation of the spectrographic tests which were employed in determining the chemical composition of the various samples, and the differences between them. He examined all specimens spectrographically and among them all, three, and three only, specimens were found to be identical. These three were: (1) the portion from the broken bottle on the floor; (2) the particle of glass found in the hair of Mrs. McNallen; and (3) the particle of glass taken from the overcoat pocket of defendant. The wide diversity and character of the other samples examined was explained to the jury. The expert stated his conclusion to be that the three specimens last named came from the same bottle.

On Monday, January 31, the officers observed a cut on the defendant's middle finger. He informed them that he had received it on Friday morning, January 28, and that it was caused by a sharp piece of metal in the place where he was working. The last work performed by the defendant ended Friday morning, January 28, at 8 a. m. Dr. Beeman testified:

> "The man had several small cuts on the back and front of the fingers of both hands, and the cuts on the left hand seemed to be a little older and more healed than those on the right. And of the cuts on his right hand there was one on his right middle finger which was abcessed, that is, infected, and another infected cut on the index finger, and at that time we were requested to see if there might

be any glass particles in it, and we didn't care to probe too much an infected wound like that; we couldn't find any.''

His conclusion was that the cuts were ''possibly one, two, three, or four days old.'' Again, he said they occurred within three, or four, or five days.

■ There is much more evidence in 750 pages of transcript which tends to support the verdict of the jury, and which appears inconsistent with any rational hypothesis of the defendant's innocence, but we think that we have sufficiently shown that there was substantial evidence tending to show that the defendant purposely and of deliberate and premeditated malice killed Anna Belle McNallen by strangling her, and that the question of guilt or innocence was, therefore, one for the jury.

The following excerpts from the record present the basis of defendant's second assignment of error:

The following conversation occurred in the judge's chambers:

''Mr. Bain: Is the defendant going to object to Berdette taking the witness stand?
''Mr. Long: You know you can't use her as a witness. Certainly, we object to her testifying.
''Mr. Bain: I want the record to show so.''

Thereafter, and in rebuttal, the following transpired:

''Mr. Bain: Call Berdette Dennis.
''Mr. Long: Now I want to be heard on that, your Honor.
''Mrs. Berdette Dennis, called as a witnes in behalf of the State, having been first duly [?] testified as follows:
''DIRECT EXAMINATION
''By Mr. Bain:
''Q. What is your name?

"A. Berdette Dennis.

"Q. And what is your relationship to the defendant?

"A. My husband."

At this point, defendant objected on the ground that nothing in the record showed that the defendant had given his consent to the testimony of his wife. The district attorney then asked for the defendant's consent. Defendant repeated his earlier objection and argued that the calling of the wife was for the purpose of prejudicing the defendant before the jury. The court then said:

"Gentlemen, the Court is prepared to rule. You all know that the wife is a competent witness, with the husband's consent. But the Court cannot permit you to proceed unless the record shows the defendant has consented to her testifying. The record is silent on it and does not show any consent. For that reason, the Court will have to hold that she cannot testify."

After defendant's objection to the examination of his wife had been sustained, the following transpired:

"Mr. Long: And I ask the Court to instruct the jury to disregard all this.

"The Court: The Court can simply say again that the parties, either one is a competent witness, but they are not permitted to testify in a criminal case except as the record does show the active consent given by the other party to the case. The law does not permit testimony of that sort to be introduced in any criminal trial."

Defendant then objected that it was prejudicial to the defendant "for the Court even to permit the District Attorney to call his witness here, because there is nothing in the record showing that we have given any consent." The court then said, "The court is simply

ruling, as a matter of law, that she is not permitted to testify.'' The witness was then excused.

Upon this matter, the court instructed the jury as follows:

> ''The law of the state provides that in all criminal cases where the husband is the party accused, the wife shall be a competent witness, but the wife in such cases shall not be compelled or allowed to testify except as they both give consent thereto. The fact that the wife did not testify in this case raises no presumption of either guilt or innocence on the part of the accused, nor are you permitted to draw any inference of either guilt or innocence from that fact.''

Defendant contends that reversible error was committed by allowing defendant's wife to give any testimony whatever, without the expressed consent of the defendant having been first obtained, and by calling upon defendant in the presence of jury to relinquish the privilege guaranteed by statute, O. C. L. A. § 26-935, it being argued that such action was tantamount to a comment upon defendant's failure to produce his wife as a witness or allow her to testify, and also amounted to an offer of improper evidence. It is further contended that none of the errors were cured by the trial court.

The statute provides:

> ''In all criminal actions, where the husband is the party accused, the wife shall be a competent witness, and when the wife is the party accused, the husband shall be a competent witness; but neither husband nor wife in such cases shall be compelled or allowed to testify in such cases unless by consent of both of them; provided, that in all cases of personal violence upon either by the other, or upon any personal violence or other unlawful act committed against

any minor child of either or both of the parties, the injured party, husband or wife, shall be allowed to testify against the other; provided further, that in all criminal actions for polygamy or adultery the husband or wife of the accused shall be a competent witness and shall be allowed to testify against the other, and without the consent of the other, as to the fact of marriage." O. C. L. A. § 26-935.

Under the provisions of O. C. L. A. § 26-935, supra, we have held that either party may be a witness when the other is the party accused, but only with the active consent of both (except in the specific instances mentioned in the provisos to that section). *State v. McGrath,* 35 Or. 109, 57 P. 321; *State v. Mageske,* 119 Or. 312, 227 P. 1065, 249 P. 364. But see *State v. Von Klein,* 71 Or. 159, 142 P. 549, Ann. Cas. 1916C, 1054.

The effect of the statute has been to remove the subject matter from the field of incompetency of witnesses as at common law and to transfer it to the field of privilege. We will first consider whether an inference unfavorable to the defendant may ever arise by reason of his failure to call his wife as a witness, or by reason of his refusal to consent that his wife be interrogated by the prosecutor, and we will also consider whether comment thereon may be permissible. Although no comment of this sort was made in the case at bar, the materiality of this inquiry is obvious. If it is not reversible error for the prosecutor to comment, then, clearly, it could not be reversible error to lay the foundation for comment by calling for the testimony of the wife. On the other hand, if it is reversible error to make such comment, it does not necessarily follow that it would be reversible error if, without comment, the prosecutor merely asks the defendant's consent to the interrogation of his wife.

There are a number of authorities which hold that it is error for the prosecutor to comment upon the failure of the defendant to call his wife as a witness, or upon the defendant's refusal to consent to her examination by the State. While criticizing this view, Wigmore indicates that the question has usually been answered in that way. 8 Wigmore, Evidence (3d. ed. 1940), § 2243. In a note, the author lists a number of American cases as supporting this view, all of which will now be considered.

*Zumwalt v. State,* 16 Ariz. 82, 141 P. 710, was a rape case. Comment on the refusal of the wife to testify was held to be error, but under the Arizona Statute, P. C. 1913, § 1228, the wife could only be examined at her own request. The defendant had no right to call her. The decision appears correct, but is not in point under a statute like ours.

*State v. Breyer,* 40 Idaho 324, 232 P. 560, was a murder case. The wife was a witness to the killing. The prosecutor commented on the failure of the wife to testify. The court referred with apparent approval to cases holding that such comment is error, but said:

> "Even if it should be held that counsel's indirect reference to the matter brings the case within the doctrine of the above authorities, appellant was under the duty of raising the question in the proper way by objecting to the statement when made, and by asking the court to properly instruct the jury. 16 C. J. § § 2268, 2269, pp. 914, 915. Appellant did none of these things, but simply asked the court to declare a mistrial of the action, which was not a necessary or appropriate remedy. The court did not err in denying this motion and the denial of it is the only error alleged or complained of."

In *Mash v. People,* 220 Ill. 86, 77 N. E. 92, comment by the prosecutor was recognized as improper, but was excused because invited by a similar comment of the defense.

*State v. Peterson,* 102 Kan. 900, 171 P. 1153, was a robbery case. The prosecutor commented on the fact that the defendant's wife was not present to testify. The Kansas Code of Criminal Procedure, § 215, provided, in part, "that the neglect or refusal of the person on trial to testify, or *of a wife to testify* in behalf of her husband, shall not raise any presumption of guilt, nor shall that circumstance be referred to by any attorney prosecuting in the case * * *." (Italics ours.) The court cited a statutory provision that judgment must be given without regard to technical errors and the judgment was affirmed, notwithstanding the erroneous comment of the prosecutor.

In *State v. Kampert,* 139 Minn. 132, 165 N. W. 972, the prosecutor called the defendant's wife as witness, but upon objection being made, her testimony was excluded. Husband and wife, though still married, were separated and it was apparent that her testimony, if given, would be adverse to the defendant. The prosecutor commented upon the defendant's failure to call his wife or to permit her to testify. It was held that the conduct of the prosecutor was improper, but that it was not reversible error.

In *State v. Shouse,* 188 Mo. 473, 87 S. W. 480, the prosecutor commented upon the defendant's failure to call his wife as a witness. The court held that "the remarks of the prosecuting attorney in regard to the wife as a witness should have been checked *in limine,* and especially after timely objection made." The con-

viction was reversed, but this case arose under Rev. Stat. (1899), § 2638, which provided in part:

> "If the accused shall not avail himself  *  *  * of the testimony of the wife  *  *  *, in the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt nor be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place."

In *State v. Harris,* 181 N. C. 600, 107 S. E. 466, the prosecutor commented on the failure of the wife to testify. On appeal, the court said:

> "We do not find that the court was lacking in diligence or promptness in excluding all references to the plaintiff's wife. There is no exception to charge of the court, nor for refusal of any prayer for instruction."

The North Carolina Statute (Revisal, § 1634, p. 917) provided:

> "The  *  *  * wife of the defendant, in all criminal actions or proceedings, shall be a competent witness for the defendant; but the failure of such witness to be examined shall not be used to the prejudice of the defense.  *  *  *"

Notwithstanding the statute, the conviction was affirmed.

In *Wilson v. Commonwealth,* 157 Va. 962, 162 S. E. 15, the prosecutor called the defendant's wife to the witness stand. On motion of the defendant she was held to be an incompetent witness. Nevertheless, the prosecutor commented on her failure to testify. This was held to be reversible error. The court, in an argument similar to that presented in the case at bar, said:

> "  *  *  * The evil which the Legislature sought to correct is exemplified in the case at bar, viz., the

intentional effort of the attorney for the commonwealth to force the accused to object to the introduction of his wife as a witness against him, and thus, perhaps, have the jury place upon him the odium of seeking to prevent a fair investigation of the transaction. * * *"

But this decision was based upon a statutory provision, Virginia Code, § 6211, which provided, in part, that neither husband nor wife

" * * * shall be compelled, nor without the consent of the other, *allowed to be called* as a witness against the other * * *. The failure of either husband or wife to testify, however, shall create no presumption against the accused, nor be the subject of any comment before the court or jury by the prosecuting attorney. * * *" (Italics ours.)

In *State v. Taylor,* 57 W. Va. 228, 50 S. E. 247, a conviction was reversed because of comment by the prosecutor on the failure of the wife to testify. This decision also was based upon a statute which provided, "nor shall any reference be made to or comment upon such failure * * *."

In *State v. Smith,* 114 Kan. 186, 217 P. 307, the prosecutor commented on the failure of the wife to testify, which was held to be error, but the court cited General Stat. of 1915, § 8215, to the effect that on appeal the court must give judgment without regard to technical errors which do not affect the substantial rights of the parties. The judgment of conviction was affirmed. There is a similar provision in O. C. L. A. § 26-1325.

The remaining case cited in the note is *State v. Bell,* 67 N. D. 382, 272 N. W. 334, which is an authority for the State and will be later considered.

Of all the cases cited by Wigmore, four only are direct authorities for holding that comment is re-

versible error, no statute being involved. They are: *Knowles v. People,* 15 Mich. 408; *National Germ. Am. Bank v. Lawrence,* 77 Minn. 282, 79 N. W. 1016 (but see *State v. Kampert,* supra); *Johnson v. State,* 1885, 63 Miss. 313; and *Fannie v. State,* 101 Miss. 378, 58 So. 2.

The defendant cites a line of cases from Michigan and Iowa which directly support his contention. Some of them not only prohibit comment upon ·the failure of the wife to testify, but they also hold that it is im-·proper for the prosecution to call for the testimony of the wife, thereby requiring the defendant to object in the presence of the jury: *People v. Werner,* 225 Mich. 18, 195 N. W. 697; *People v. Trine,* 164 Mich. 1, 129 ·N. W. 3; *People v. Kaplan,* 256 Mich. 36, 239 N. W. 349 (privilege of attorney and client); *McConnell v. City of Osage,* 80 Iowa 293, 45 N. W. 550, 8 L. R. A. 778 (privilege of physician and patient); *Johnson v. Kinney,* 232 Iowa 1016, 7 N. W. (2d) 188, 144 A. L. R. 997.

Defendant also relies on the early case of *Stutsman v. Territory,* 7 Okl. 490, 54 P. 707. In that case it was held that no inference could be drawn from failure of a defendant to produce his wife as a witness. But in the more recent case of *Wissinger v. State,* 39 Okl. Cr. 324, 264 P. 631, the supreme court said of the Stutsman case:

" * * * That was an extreme rule even at that time. This court has materially changed the rule announced in the following cases: Rhea v. Ter., 3 Okl. Cr. 231, 105 P. 314; Hampton v. State, 7 Okl. Cr. 291, 123 P. 571, 40 L. R. A. (N. S.) 43; Manning v. State, 7 Okl. Cr. 367, 123 P. 1029."

The ruling in the Wissinger case was as follows:

"The wife cannot be called as a witness to testify against her husband except for offenses

committed against her person, but she is a competent witness in his behalf in all cases, and where as in this case the evidence discloses that the wife was with her husband at the time of the offense charged and might be a material witness, his failure to call her as a witness is a proper subject of comment."

To the same effect, see *McCurdy v. State,* 39 Okl. Cr. 310, 264 P. 925.

*State v. Hatcher,* 29 Or. 309, 44 P. 584, cited by the defendant, will be discussed later.

With the exception of the Michigan and Iowa decisions which support the defendant's position, the cases cited in the note to Wigmore, supra, and in the brief of the defendant do not make an impressive array. Six of the cases are based on the express provisions of statute: *State v. Peterson, State v. Shouse, State v. Harris, Wilson v. Commonwealth, State v. Taylor,* and *Zumwalt v. State,* all supra. In six of the cases, comment was considered improper, but not reversible error: *State v. Breyer, Mash v. People, State v. Peterson, State v. Kampert, State v. Harris,* and *State v. Smith,* all supra.

We will next consider the authorities which support the contention of the prosecution. In the recent case of *United States v. Fox,* 97 F. (2d) 913, the defendant was convicted of robbery. He had been on relief, but after the robbery he bought a second-hand car, explaining that his wife had received an inheritance. His wife was not called as a witness. The circuit court of appeals for the second circuit, by Judge L. Hand, said:

"  *  *  *  The inference that she would not have confirmed him drawn from his failure to call her was much stronger than the contrary inference from

the prosecution's failure; and his privilege against self-incrimination did not protect him against such an inference. * * *"

In *People v. Hovey,* 92 N. Y. 554, the defendant was convicted of murder. The court instructed the jury as follows:

" 'There is no eye-witness who has testified to the occurrence, except the defendant. The people claim, however, and the uncontradicted evidence established that there was another eye-witness to this occurrence, namely, the wife of the defendant. You remember when the wife was offered as a witness on behalf of the people, the court would not allow her to be examined as a witness against her husband, for, in my judgment, the law does not permit it, but while that is so, the law does allow the wife to be a witness in her husband's behalf, and the people claim that inasmuch as it appeared in evidence that she was an eye-witness to the occurrence, accessible to the defendant, and the defendant allowed by the law to call her as his witness, and having neglected to do so, that that is a circumstance which the jury have a right to consider on coming to a conclusion. And the people claim, moreover, that the prisoner's omission to call her as a witness under the above circumstances should be taken as a matter of evidence against him, and they claim that the fair presumption is that if she was called her testimony would not be favorable to the defendant.' "

The court of appeals said: "We think the charge was unexceptionable." The Hovey case is cited with approval in *Deutschmann v. Third Ave. R. Co.,* 87 App. Div. 503, 84 N. Y. S. 887.

In *Smith v. State,* 90 Tex. Cr. R. 24, 232 S. W. 497, the court refers to the rule "so well established that it is unnecessary to cite authorities, that the state's

counsel has right to argue the failure of accused to use his wife as a witness * * *." To the same effect, see *State v. Brown*, 118 La. 373, 42 So. 969.

In *Commonwealth v. Spencer*, 212 Mass. 438, 99 N. E. 266, Ann. Cas. 1913D, 552, defendant was convicted of murder. The Massachusetts statute provided "neither husband nor wife shall be compelled to be a witness on any trial upon an indictment, complaint or other criminal proceeding against the other." The defendant asked an instruction that "the wife of the defendant is privileged by law from testifying if she desires, and consequently no inference is to be drawn against the defendant because she did not testify * * *." The supreme court referred to the statute which provides that the defendant in a criminal proceeding may testify for himself, but that his failure to testify shall not be taken against him. It then commented on the fact that there is no such statute concerning the failure of the defendant to call his wife. The court said:

"* * * As to their testimony against each other either may testify, but shall not be compelled so to do in a criminal proceeding against the other. The privilege is that of the spouse called and not of the defendant. In the case of the defendant in a criminal suit the question whether he will testify is decided by him alone. In only this last case is his failure to produce the evidence not to be taken against him. In all other proceedings and as to all witnesses except himself in a criminal proceeding against him, the defendant is left to the general principles of law as to what inference may be drawn against him for his failure to produce evidence in his favor. In this respect our statute differs from those of some states which expressly provide that the failure of one spouse to produce the other shall not in a criminal case be taken against the defend-

ant.'' *Commonwealth v. Spencer,* supra (212 Mass. 438, 99 N. E. 266, 271).

It was held that the court did not err in refusing to give the requested instruction. See also *McMichael v. State,* 49 Tex. Cr. R. 422, 93 S. W. 723; *Harrison v. State,* 102 Tex. Cr. R. 385, 278 S. W. 430; and *Hampton v. State,* 7 Okl. Cr. 291, 123 P. 571, 40 L. R. A. (N. S.) 43.

■ ·In support of his contention that such comment was improper, and by way of analogy, the defendant has cited a great number of cases which hold that it is error for the prosecutor to comment on the failure of a *defendant* to testify in his own behalf. That rule is firmly established and citation was unnecessary. Defendant also relies strongly on certain language from the opinion by Justice MOORE in *State v. Hatcher,* supra (29 Or. 309, 44 P. 584), as follows:

> ''If no presumption of the defendant's guilt can be invoked by reason of his failure to testify in his own behalf, how can such a presumption be created by his failure to produce his wife as a witness, when she cannot be compelled to testify without her consent?''

The reasoning of the Hatcher case appears to involve a nonsequitur. The statute provides that in the trial of any person charged with the commission of a crime, ''the person so charged or accused shall, at his own request, but not otherwise, be deemed a competent witness, * * * provided, his waiver of said right shall not create any presumption against him * * *.'' O. C. L. A. § 26-934. *State v. White,* 48 Or. 416, 87 P. 137.

It has even been intimated by way of dictum that the rule against comment on the failure of the defendant to testify stems from the constitution. *State v. Black,* 150

Or. 269, 286, 42 P. (2d) 171, 44 P. (2d) 162.   The failure of a defendant to testify raises no presumption of guilt for the simple reason that the statute expressly provides that no such presumption shall be created, and the duty of the prosecution to refrain from comment necessarily follows.' There is no constitutional provision and no similar statute which applies to the failure of a defendant to call his wife, nor to his refusal to permit her interrogation.

■ In contrast to the provision which prohibits comment on the failure of defendant to testify stands the general rule that it is not improper for counsel to comment on the failure of the opposing side to produce or use available and competent witnesses or evidence when the circumstances justify an unfavorable inference from such failure.   23 C. J.S., Criminal Law, § 1099, pp. 555-6; *State v. Mims,* 36 Or. 315, 61 P. 888; Wigmore, Evidence (3d ed. 1940), vol. 2, §§ 285-6, vol. 8, § 2243.

> " * * * But the exercise by an accused of a right which he possesses may, under proper circumstances, be the subject matter of comment by the district attorney.   For instance, the defendant has a right not to call any witnesses, yet his exercise of this right may, in the discretion of the trial judge, be the subject of comment: * * * Possibly it is not technically accurate to say that in these instances the right possessed by the defendant becomes the subject of comment; rather it is his failure, in the face of incriminating circumstances, to explain which becomes the occasion for comment. * * *"   *State v. Black,* supra (150 Or. 269, 286).

The question as to the propriety of permitting comment on the failure of a defendant to call his wife as a witness, or on his refusal to consent that she

testify, lies in a middle ground between the prohibited comment on the defendant's refusal to testify, and the permitted comment on the defendant's failure to call other witnesses. This distinction was recognized in a similar case where the question arose as to the duty of the court to instruct a jury that no unfavorable inference is to be drawn from the fact that a codefendant not on trial fails to testify for the defendant. This court said:

"* * * Our statute has given to a defendant on trial the right to testify in his own behalf and at the same time declared that his waiver of such right shall not create any presumption against him. The favor to the defendant is given by the statute and is limited to his own act of testifying or not, as he may choose, and is not intended to apply to what he might say or do if testifying, or to what others testify about him or his acts or declarations. No presumption shall be created against him by reason or because of his act in failing to testify. The law does not say no presumption shall be created against him by evidence of what he may have said or done in other matters as shown by the testimony of his acts and declarations in such matters. The favor is granted the defendant in respect to his own failure to testify, and not for the failure of some one else, whether competent or not. No such favor is extended the defendant for the act of his codefendant not on trial. * * *" *State v. White,* supra (48 Or. 416, 429).

In *State v. Hatcher,* supra, the district attorney in argument stated to the jury that

"' * * * it was in the power of the defendant to have produced her; that she could have told all about the affair; and that if present her testimony would have been adverse to the defendant, otherwise he would have secured her attendance, but failing

to do so is proof that her testimony would have been against the defendant.' ''

The court stated, first, that the record failed to disclose that the defendant's wife was, at the time of the trial, within the reach of the process of the court and very properly held that comments by the district attorney were therefore not based upon any evidence in the case. As its second ground for decision, the court held that the record was silent as to whether the wife had consented to become a witness for her husband, ''for without such consent upon her part she could not be compelled to testify.'' The court affirmatively based its second proposition upon the statute which relates only to comment on the failure of *defendant* to testify. The case is criticized by Wigmore on Evidence, vol. 8 (3d ed. 1940), § 2243, n., p. 269, upon the identical ground which we have suggested, namely, that the court treated the matter as analogous to the situation where comment is made on the failure of a defendant to testify. The comment by the learned author is as follows:

> ''State v. Hatcher * * * left doubtful, though erroneously treated as involved in the privilege, on the same principle as in the privilege against self-crimination; but held that in any case the failure shows nothing unless it appears that the wife was within the jurisdiction, and that she was willing to waive her privilege * * *.''

It should also be noted that Justice MOORE was referring to the fact that the record was silent as to the consent of the wife to testify. The Hatcher case did not involve the question which arises in this case in which the availability of the wife as a witness was established and the cause of comment related not to

the want of consent by the wife, but to the refusal by the defendant. In any event, we are not required to determine whether the Hatcher case, properly construed, prohibits comment upon the refusal of the defendant to permit the interrogation of his wife. Assuming, without deciding, that it correctly prohibits such comment, the Hatcher case is not decisive in the case at bar for here the prosecutor made no comment on the defendant's refusal to permit her to testify. The record here presents a very different question, namely: did the trial court err in permitting the prosecution to call the defendant's wife to the witness stand, elicit from her her name and relationship, and then ask for the defendant's consent to her examination as a witness? We must bear in mind the fact that the objection of the defendant to permitting the testimony was sustained, and that the court thereafter correctly instructed the jury that no inference or presumption, either of guilt or innocence, can be drawn from the fact that she did not testify.

On this issue, the authorities are sharply divided. The position of the prosecution enjoys the weighty support of Wigmore who asserts the right of the prosecution to call for the testimony of the wife, although he recognizes that some authorities prohibit comment upon the nonproduction of the wife, or upon the defendant's refusal to consent to her examination.

" * * * Furthermore, in any event, upon the same principle as under the privilege against self-crimination (*post*, § 2272), the party desiring to compel the spouse to testify may at least *call for the testimony*, and is not to be deprived of it until the party-spouse formally objects and claims the privilege." 8 Wigmore, Evidence, (3d ed. 1940) § 2243, p. 271.

We turn now to a group of decisions which were rendered under statutes similar in character to O. C. L. A. § 26-935, supra, and under which the testimony of the wife could be had only with the consent of the defendant.

In *State v. Warlick*, 179 La. 997, 155 So. 460, the defendant was convicted of murder. In the course of the trial, the State called the defendant's wife as a witness. Counsel for the defendant informed the court that she was not willing to testify, basing her refusal upon the ground that she was the wife of defendant. The court excused her. The defendant contended that she should not have been questioned in the presence of the jury. The court quotes from *State v. Werner*, 128 La. 2, 54 So. 402. In the latter case, the wife of the defendant was placed on the stand, after the State's attorney, in private, had been notified that the wife would not be permitted to testify. The opinion quotes from the Werner case as follows:

> " ' * * * Here, again, we do not think any prejudice sufficiently serious can have been done the accused to justify setting aside the verdict. The wife did not testify. Objection was made at once, and the judge sustained the objection, and, at the same time, warned the jury in these words: "Gentlemen, I charge you that you are not to be influenced by the appearance of the wife, as it has absolutely nothing to do with the case." ' " *State v. Warlick*, supra.

It was held that the defendant, Warlick, was not prejudiced and the conviction was affirmed.

In *State v. Bell*, supra (67 N. D. 382, 272 N. W. 334), the defendant wife was convicted of forgery. At the trial the prosecution asked the defendant if she would

consent to have her husband testify. She refused to give her consent and the prosecutor commented on that fact in argument before the jury. It was held that the assignments of error upon the above ground were not properly before the court. However, the court said, "But, in any event, the defendant's contentions in this regard could not be sustained on the record as made." The defendant had testified concerning conversations with her husband. Upon inquiry by the court, she stated that her husband was in the court room. The defendant contended that the inquiry as to whether she would consent to the examination of her husband should have been made out of the presence of the jury. The court said:

"It seems to us there is no ground for this contention. The record discloses no more than we have indicated above. Mrs. Bell had testified as to her conversation with her husband. She predicated her defense upon what he told her when he gave her the draft and her belief in what he then said. The State could not have anticipated that this testimony would be offered. As a matter of privilege, grounded on public policy, her husband could not be examined as a witness against her without her consent. This privilege was personal to her. She might waive it. The inquiry as to whether she would give her consent had to be made of her at some time. We cannot see why her husband's testimony should be distinguished from any other relevant evidence subject to objection that might be offered. Besides, the State did not concede that her testimony was to be accepted as true. If her husband were present and not called, the natural inference would be that he would corroborate it. The jury were entitled to know why he was not called. The theory behind the privilege is that to permit either spouse to testify against the other without that other's consent, would tend to domestic disharmony. The privilege

is a shield and not a sword. It is not conferred to enable him who exercises it thereby to strengthen his case. So there was no impropriety on the part of the State in bringing up the matter as it was brought up, nor can we see how any prejudice resulted. There are cases holding that such an inquiry made in open court before a jury may be so prejudicial as to warrant a reversal. But it seems to us that reason, as well as the greater number of authorities, is to the contrary. * * *'' *State v. Bell,* supra.

In *People v. Reitz,* 86 Cal. App. 791, 261 P. 526, defendant was convicted of perjury. On appeal, the court said:

'' * * * The action of the assistant district attorney in calling the former wife as a witness and in later referring to his inability to use her because of appellant's objection is assigned as error. The state, of course, was entitled to call the former wife as a witness, and her testimony could have been received if the appellant had not entered his objection. There was therefore no error in calling this witness to the stand. The assistant district attorney referred to his inability to use the wife as a witness while he was arguing to the trial judge the necessity of giving him a wider latitude in the cross-examination of another witness. The apellant assigned this as misconduct, but did not request an admonition to the jury. Later in the course of the trial the assistant district attorney asked appellant's consent to put the former wife upon the stand to testify as to whether certain writing was hers. The consent was not given, and the remark of the assistant district attorney was assigned as misconduct. Although no admonition to the jury was requested, the court on that occasion did expressly warn the jury to disregard the remarks of counsel.'' *People v. Reitz,* supra.

The conviction was affirmed.

In *State v. Damm*, 62 S. D. 123, 252 N. W. 7, 104 A. L. R. 430, the defendant was convicted of rape upon his daughter. The State called the defendant's wife as a witness. After being sworn, she stated, in response to questions, her name and that she was the wife of defendant. The prosecutor then asked permission of the defendant to "place his wife on the stand to testify." This was done in the presence of the jury, and the action was assigned as error upon appeal. The court said:

"  *  *  *  It is the general rule, however, as stated by Professor Wigmore (Wigmore on Evidence (2d Ed.) § 2243) that 'the party desiring to compel the spouse to testify may at least call for the testimony, and is not to be deprived of it until the party-spouse formally objects and claims the privilege.' Cf. also Commonwealth v. Weber (1895) 167 Pa. 153, 31 A. 481; State v. Roby (1915) 128 Minn. 187, 150 N. W. 793, Ann. Cas. 1915D, 360; State v. Virgens (1915) 128 Minn. 422, 151 N. W. 190. It seems quite plain in this case that, if counsel for appellant had been permitted to finish his objection (which was being made in the presence of the jury and which would necessarily have been based on the ground that the wife was not a competent witness against appellant without his consent), and the court had sustained such objection, as, of course, it would have done, no prejudice could well be urged, although it would have been entirely apparent to the jury that the state was desirous of having the wife testify, and that her testimony was excluded because appellant was availing himself of his statutory right and was unwilling to have such testimony admitted. We do not commend the practice of calling the husband or wife of a party defendant to the stand and in the presence of the jury asking consent to their testimony, and in this case it would

have been better had the matter been otherwise handled. We do not believe, however, that prejudicial error was committed or that we would be justified in reversing this case upon this ground. The state being entitled to call the wife and proceed with her examination until the objection by the appellant, so far as concerns the matter of prejudice we can find no particular distinction between calling the witness and requesting the consent of the appellant to her examination and calling the witness and proceeding with her examination until appellant asserted his non-consent." *State v. Damm,* supra (62 S. D. 123, 130).

In *Commonwealth v. Weber,* 167 Pa. 153, 31 A. 481, it was contended that the court erred in allowing the Commonwealth to offer to place the wife of the defendant on the stand as a witness for the prosecution. The court said:

" * * * We know of no way the court can rule on an offer without hearing it. It was to call the wife if defendant did not object. Defendant did object, and she was rejected. There could have been no other ruling except to admit her testimony, and this would have been manifest error. The assignment, in effect, is that the Commonwealth called an incompetent witness, the defendant objected, and the court sustained the objection; therefore the court erred. The offer being overruled, that necessarily made it a silent part of the record, and it had no effect in the trial that striking it from the record would cure."

The Weber case arose under a statute which provided that a wife is not competent to testify against her husband. Purdon's Pa. Stat. Ann. Tit. 19, § 683.

In *State v. Roby,* 128 Minn. 187, 150 N. W. 793, Ann. Cas. 1915D, 360, defendant was charged with the crime of carnal knowledge of a female infant. Before trial,

the defendant served notice on the prosecution in which he objected to the taking of any evidence of the defendant's wife, "either before the grand jury or elsewhere or otherwise." At the close of the State's case, the county attorney said:

"'I would like to call Mrs. Roby.' Objection was made that she was incompetent. The court said:

"'She is competent but she is excluded from testifying without his consent; if you do not consent to it she cannot testify.'

"Defendant's counsel again objected. The county attorney then said:

"'I guess that is true—as long as there is objection to it she cannot testify because she is his wife.'

"Thereupon defendant's counsel excepted to the offer as improper and prejudicial, and asked 'that the jury be instructed as to that.' It is contended the offer to call Mrs. Roby was such misconduct as to warrant setting aside the verdict of the jury. * * *."

The court cited authorities on both sides of the issue and said:

"We are not disposed to go to either of these extremes. In National German-American Bank v. Lawrence, 77 Minn. 282, 79 N. W. 1016, 80 N. W. 363, it was said, the failure to call a spouse is not a case of suppression of evidence which warrants the court in instructing the jury that they might infer that the testimony would be unfavorable. On the other hand, it is quite clearly established that the wife is a competent witness, and that her testimony may properly be received and considered unless objected to on the ground of privilege. In re Holt's Will, 56 Minn. 33, 57 N. W. 219, 22 L. R. A. 481, 45 Am. St. Rep. 434; Coles v. Shepard, 30 Minn. 446, 16 N. W. 153; Haataja v. Saarenpaa, 118 Minn. 255, 260, 136 N. W. 871. As applied to the facts of this case, we think the proper rule is stated by Wigmore as follows:

" 'The party desiring to compel the spouse to testify may at least call for the testimony, and is not to be deprived of it until the party spouse formally objects and claims the privilege.' 3 Wigmore, Evidence, § 2244.

" And we believe this procedure has been usually followed in this state.

"It is claimed the previous notice of defendant advised the county attorney that consent was withheld, and rendered his conduct wrongful. Precedent will not aid us much in determining the effect of this notice, for it is quite unusual for a person to make objection to testimony which may be offered to prove a crime against him, on the ground of privilege or otherwise, before he has been indicted of any offense. But we think the effect of the notice should not be held such as to make it misconduct for the state to proceed in the usual way. The court might properly enough have instructed the jury that the objection of the defendant to the testimony of his wife should not weigh against him, but we cannot hold that the failure to do so was error." *State v. Roby,* supra.

The same rule was applied in *State v. Virgens,* 128 Minn. 422, 151 N. W. 190.

In *Hampton v. State,* 7 Okl. Cr. 291, 123 P. 571, 40 L. R. A. (N. S.) 43, the court construed the statute as holding that a wife could testify in behalf of her husband, the defendant, as to confidential communications. In that case, the wife was not called by the defendant, which fact was made the subject of comment by the prosecution over objection of the defendant. The court said:

"In the case of Rhea v. Territory, 3 Okl. Cr. 231, 105 Pac. 314, this court held that in a criminal case, where it appears from the record that the wife of a defendant is a material witness in the case in his

behalf, and he does not place her on the witness stand, such failure upon the part of the defendant to call his wife as a witness may be commented upon by counsel for the state. We are still of the same opinion.

\* \* \*

"We believe that the remarks made by the prosecuting attorney in this case were fully justified by the evidence \* \* \*." *Hampton v. State,* supra; and see, *Wissinger v. State,* supra (39 Okl. Cr. 324, 264 P. 631).

The Oklahoma statute provides that the wife shall not be a witness against, but may testify for, her husband. Oklahoma Comp. Laws, 1909, § 6834.

The argument of the Michigan and Iowa decisions is to the effect that the benefit of the privilege conferred by statute would be destroyed if the prosecutor should be permitted to "put the defendant on the spot" by requiring him to exercise it. The answer to this argument merely requires a definition of the privilege which it is claimed would be thus destroyed. The statute defines it. The wife shall be competent, but shall not be "compelled or allowed to testify" unless by consent. The privilege of the defendant is to exclude relevant and otherwise competent evidence as to the truth or falsity of the charge. This privilege the statute gives him, but it is a shield against the truth, not a sword for the crippling of the prosecution. If, as claimed, an adverse inference unavoidably arises in the minds of the jury from the failure to produce available and relevant testimony notwithstanding an instruction by the court that they should draw no inference, then it appears more in consonance with the modern and enlightened principles of justice that the one who excludes the truth should bear the burden rather than the one

who desires, but can not produce it. The law is a practical science. It can not wholly control the rational mental processes of the jury, but it must, and often does, satisfy itself by directing their minds in accordance with rules of law. The State was at least entitled to make clear to the jury that no adverse inference should be drawn against it by reason of the non-production of defendant's wife.

██ Since no reversible error was committed by calling the defendant's wife to the stand and requesting his consent to her examination, it certainly follows that he was not prejudiced by the further fact that the wife, when called, stated her name and that she was the wife of defendant. Such statement by her was preliminary only, in that it laid the foundation for the requested consent. In prosecutions for bigamy or adultery, testimony by a witness that she is the wife of defendant would constitute evidence of a material fact tending to the conviction of the defendant, but in the case at bar the same testimony does not tend to establish any issue in the case, and defendant was not prejudiced thereby.

As assignment of error number three, the defendant asserts that the court erred in failing to sustain defendant's objections to evidence of alleged crimes separate and distinct from the crime charged in the indictment. The witness Gossett was asked by the prosecutor to repeat conversations between himself and the defendant "regarding particularly Mrs. McNallen, and incidentally it may involve his wife." The witness said: "Well, I noticed marks on his wife's throat." The answer was not responsive to any question asked. Upon objection being made, the court reserved its ruling and announced that it would be withdrawn from the jury's consideration unless "tied in with the defendant in

some manner." Concerning his conversation with the
defendant, witness Gossett said:

> " * * * I mentioned the fact to him in his room
> up there about beating up on his wife and Mother,
> and I also told him that if it was my wife and daugh-
> ter that he had been beating up on and I considered
> that they were one of the family, I would take the
> matter up, myself, and I wouldn't be as easy on him
> as in the previous case with his Mother, with his
> shooting affair.
>
> * * *
>
> "A. We also discussed that there.
> "Q. All right. Go ahead with your discussion.
> "A. Well, about the time that he had the gun up
> to the house there, and it seemed like they got in a
> fight and he shot at one of the boys. He told me
> he didn't know the gun was loaded."

The witness explained the source of his information
by saying, "That was conversation between the two
of us in the room." Objection was again made that the
state was trying to show a separate and distinct crime.
The court again reserved its ruling. The prosecutor
then asked:

> "Q. Did you or did you not discuss with Mr. Den-
> nis his beating up on his Mother and daughter-in-
> law?
> "A. I did.
> "Q. All right. Tell us what you said about it.
> "A. Well, I told him, I said, 'If you two can't get
> along without beating up on one another and going
> to this extent, you had better separate.' I said,
> 'Don't never beat up on them again.' And the con-
> versation came up in regards to drinking and I told
> him, 'If you don't quit this drinking, it is going to
> get you in a lot of trouble.' "

The district attorney's question was obviously a slip
of the tongue. There is no evidence in the case con-

cerning defendant's mother or daughter-in-law. The question was intended and understood to refer to the defendant's mother-in-law and her daughter. Thereafter, and as counsel for the defendant claimed, from fifteen to twenty minutes later, the court instructed the jury as follows:

> " * * * Gentlemen, the Court stated in the course of the examination of this last witness that the Court would hold in reservation the matter of disallowing certain testimony,—passing upon objections to the testimony offered by this last witness. The Court will now advise you that that testimony pertaining to the matter of the discharge of a gun, given by this witness, is stricken from the record and is withdrawn from your consideration. You are not to consider that as any evidence of any matter in connection with this case. It has no bearing on the case, from his testimony. So that is stricken from the record and withdrawn from your consideration, any conversation he had with the defendant relative to the discharge of the firearm."

On cross-examination of the defendant, the following transpired:

> "Q. Did you ever lay your hands on your wife?
>
> "A. I spanked her once, yes.
>
> "Q. Spanked her. How many times did you choke her?
>
> "A. Never.
>
> "Q. Isn't it a fact that the reason they left and went to Peck's house was because you were choking your wife at the time?
>
> "A. It is not."

█ There was no objection to, or motion to strike, that testimony. The defendant also complains of the fact that the district attorney, over objection, "was

allowed to ask several questions insinuating that defendant used intoxicating liquor and had been under the influence of liquor at one time over a month prior to the death of the deceased." There is no merit to this objection. The drinking of intoxicating liquor is not a crime and the question as to whether the defendant was under the influence of intoxicating liquor related to an incident on Christmas day, concerning which the defendant had testified. It was not improper to test the accuracy of defendant's recollection by asking the question. Furthermore, the defendant's answer was that he was not under the influence of liquor.

The foregoing excerpts constitute all of the testimony concerning other offenses, the receipt of which was assigned as error in defendant's brief.

We will first consider the evidence of the alleged shooting. We think no error was committed for the following reasons: (1) The evidence was stricken and the jury were instructed to disregard it. (2) The witness Gossett was not present at the alleged shooting and testified only to what defendant had told him. Witness said, "He told me he didn't know the gun was loaded." It is therefore not clear that there was any evidence of a crime. *State v. Roberts,* 15 Or. 187, 13 P. 896. (3) The defendant, in the absence of the jury, made a formal offer of proof concerning the entire transaction leading up to the alleged shooting. Briefly stated, the defendant offered to testify that he was defending Mrs. McNallen from abusive action of her son Bill McNallen; that the defendant carried the rifle in his arm with the point toward the floor; that there was a scuffle and the rifle was discharged, going through the floor. The offer was made by the defendant for the purpose of showing the alleged friendly rela-

tions existing between the defendant and his mother-in-law. Counsel for the defendant said:

"I am not paying any attention to Gossett at all. If Gossett had not testified to it, I would have gone into it, anyway, for the purpose of showing he became engaged with the son, Bill McNallen, in sticking up for his Mother-in-law. That is my purpose in offering the testimony. And also, as I say, to refute any inference that was left by the witness, Gossett."

In view of defendant's statement that he would have introduced the same evidence even if Gossett had not testified, it cannot be said that the defendant was prejudiced by the testimony of Gossett.

If there was any evidence as to previous violence by the defendant towards Mrs. McNallen, it was relevant and admissible on the issue of malice.

As to the evidence concerning the alleged violence by the defendant towards his wife, we observe, first, that there is no evidence that defendant choked his wife. The evidence merely discloses that she had marks upon her throat at one time; that the prosecutor asked defendant if he had choked her and that defendant denied it. True, the defendant admitted that he spanked his wife twice. Under the circumstances of this case, we hold that the insinuations of violence as contained in the prosecutor's questions and evidence of the admitted spankings did not constitute reversible error. The case for the prosecution necessarily depended upon a showing of the relationship between three persons: the defendant, his wife, and the deceased mother-in-law; the hostility of the defendant toward the deceased; the origin of that hostility in the trouble between the defendant and his wife; and the interference in behalf of the wife by the mother-in-law. If it be said that

there was evidence in the case that the defendant committed a crime against his wife, we hold that the evidence was relevant upon the charge of murdering the wife's mother.

An almost identical situation was presented in the case of *Smith v. State,* supra (232 S. W. 497), in which the defendant was convicted of the murder of his mother-in-law. In that case, as here, there was evidence that the defendant believed the mother-in-law had interfered between himself and wife. The State contended that the mother-in-law had interfered because of misconduct of the defendant toward his wife. Evidence was received concerning the misconduct of defendant toward his wife and of bruises which were seen by witnesses upon her body. It was held that no error prejudicial to the defendant was committed and the conviction was affirmed.

■ The mere fact that evidence discloses the commission of some crime other than that charged in the indictment does not of itself constitute error. Evidence of collateral crimes tending to prove the commission of the crime charged in the indictment is admissible. *State v. Sullivan,* 139 Or. 640, 11 P. (2d) 1054; *State v. Evans,* 143 Or. 603, 22 P. (2d) 496; *State v. Christiansen,* 150 Or. 11, 41 P. (2d) 442; *State v. Gillis,* 154 Or. 232, 59 P. (2d) 679; *State v. Garner,* 166 Or. 1, 108 P. (2d) 274; *State v. Ewing,* 174 Or. 487, 149 P. (2d) 765.

■ The receipt in evidence of two photographs showing the position of the body of the deceased when found by the officers is assigned as error. This is another attempt to establish a rule for the exclusion of so-called "gruesome" evidence. It must fail. The photographs explained and supplemented the testi-

mony of the witnesses as to the relevant circumstances. *State v. Nelson,* 162 Or. 430, 92 P. (2d) 182.

As his fifth assignment, it is asserted that the court erred in giving the following instruction:

"The law conclusively presumes a malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another."

This instruction follows the exact wording of O.C.L.A. § 2-406 (2).

In view of the gravity of the case, we will briefly comment on the foregoing assignment of error, although no exception was taken at the trial. Counsel strenuously contends that the instruction was erroneous, and in support asserts that the presumption of malice from the proof of killing is insufficient to support a conviction for first degree murder, for there is no presumption of premeditation from the mere proof of killing. The statement is correct, but the trial court did not instruct that the presumption of malice was relevant upon the issue of premeditation or deliberation. Counsel cites *State v. Carver,* 22 Or. 602, 30 P. 315, and *State v. Cunningham,* 173 Or. 25, 144 P. (2d) 303, which related to the effect of the statute which provides that there is a conclusive presumption of an intent to murder from the deliberate use of a deadly weapon, causing death within a year. This court has properly pointed out that such a presumption applies only to murder in the second degree. Counsel for the defendant has confused the instruction which was given by the court, and which relates only to malice which is presumed from the deliberate commission of an unlawful act for the purpose of injuring another, with the presumption of intent to murder under the provisions of O. C. L. A. § 2-406 (1). It was relevant for

the State to show that the defendant bore malice toward the deceased, and the presumption was properly called to the attention of the jury.

■ It is contended that the court erred in refusing to give an instruction to the effect that there was no evidence of premeditation. The instruction was properly refused. The charge of first degree murder was properly submitted to the jury.

■ Defendant also "excepts to the court's instructing the jury as to the definition of malice * * *." The instruction given followed the language of O. C. L. A. § 23-111. The assignment of error was without merit.

We will consider the sixth and eighth assignments of error together. It is contended that the court erred in instructing the jury as follows:

"In establishing the degree of proof required, the State may rely upon either direct or indirect, or circumstantial evidence."

The court then gave the statutory definitions of direct and indirect evidence, to which exception was taken. The court then gave a general instruction on circumstantial evidence, to which no exception was taken. Defendant contends that by defining direct evidence the court let the jury assume that there was direct evidence in the case. Exception was also taken to the refusal of the court to give a requested instruction on circumstantial evidence, or to give it in modified form. Though not in the words of the request, we think the court sufficiently covered the substance thereof in the instruction which was given.

■ The defendant also asserts that the court erred in refusing to instruct the jury in express terms that

the case rested on circumstantial evidence only. But as a part of the instruction given, the court said:

"Circumstantial evidence to be sufficient for a conviction *in this case* must be of a conclusive nature * * *." (Italics ours.)

By this language the court sufficiently indicated that the State relied on circumstantial evidence for conviction. We think the statutory definition of direct evidence was given, not to indicate that there was direct evidence, but to make clear to the jury the distinction between direct and circumstantial evidence. The jury knew that there was no eyewitness to the killing, and we think they could not have been misled into believing otherwise.

■ In *Kastel v. United States,* 23 F. (2d) 156, the defendant requested an instruction that there was only circumstantial evidence in the case. The request was refused. The circuit court of appeals for the second circuit, by Judge L. Hand, said:

"The judge was not called upon to characterize the evidence as direct or circumstantial."

To the same effect, see *Pitts v. State,* 197 Ga. 317, 28 S. E. (2d) 864; *Pennington v. State,* (Texas Criminal Appeals) 48 S. W. 507; *Thompson v. State,* 166 Ga. 758, 773, 144 S. E. 301; *State v. Busing,* Iowa 251 N. W. 620; *Scott v. State,* 102 Tex. Cr. R. 142, 277 S. W. 640; and *Pound v. State,* 180 Ga. 83, 178 S. E. 291. We think the court did not err in failing to segregate and give that portion of defendant's requested instruction which stated that the evidence was exclusively circumstantial.

By assignment number seven it is claimed that the court erred by instructing the jury

" * * * that at the outset the defendant is presumed to be innocent, and this presumption of

innocence abides with the defendant until such time, if at all, that the State satisfies you beyond reasonable doubt of the guilt of the defendant   \*   \*   \*.''

In his exception, the defendant claimed

" \*   \*   \* that the presumption under the law attends the defendant all throughout the trial, and the jury is not permitted to make up its mind   \*   \*   \* until at the conclusion of the trial they have retired for their deliberation.   \*   \*   \*''

■ In *State v. Anthony,* 62 Or. 141, 124 P. 475, the court instructed the jury as follows:

" 'A defendant in a criminal action is presumed to be innocent until the contrary is proven, and, in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to be acquitted.' "

An exception was taken thereto, but this court held that the instruction fairly stated the law. See also *State v. Gibson,* 43 Or. 184, 73 P. (2d) 333; *Metropolitan Casualty Ins. Co. of N. Y. v. Lesher,* 152 Or. 161, 52 P. (2d) 1133; and O. C. L. A. § 2-405, which provides that the presumption of innocence may be overcome by other evidence. The instruction given was in the usual form and was sufficient.

Exception was taken to the fact that the jury was recalled to receive the instruction on the presumption of innocence after they had retired. The record shows that the court was under the impression that the instruction had been given, but being in doubt, it recalled the jury and instructed them as above set forth. It is frequently urged that undue emphasis is given to an instruction when a jury is recalled from the jury room to receive it, but the converse of that argument comes with refreshing novelty.

■ The only case cited which lends color to the defendant's contention is *Dodson v. United States,* 23 F. (2d) 401. In that case, the court said:

"We think, too, that the defendant was entitled to have the jury instructed as to the presumption of innocence at the time when they were given the other instructions in the case. Jurors understand that they are to be guided in their deliberations by the instructions given them after the testimony is concluded; and the accused is entitled to have any proper instruction given at that time. An instruction given at the beginning of the trial is likely to be forgotten or misunderstood * * *."

In that case, a charge which "minimized the presumption" was given before the introduction of any testimony. Obviously, the danger that the instruction would be forgotten which was present in that case does not apply in the case at bar.

The ninth assignment of error relates to the closing argument of the district attorney. Mrs. Burnside, when called as a witness for the defendant, testified, in substance, that she had made full disclosure of the evidence at the police station. It was conceded by the State that the transcript of her examination at the station was complete and did not contain any reference to the wiping of the telephone receiver by the defendant, concerning which she testified at the trial. Witness, however, insisted that she had told it several times and stated that she had testified before the grand jury. Such was the background of the prosecutor's argument, which was apparently in reply to argument of the defense, for he said, "Now they talk about Mrs. Burnside's statement down at the police station." The transcript does not contain the argument of the defense, so we can not tell to what extent the comments of the prosecutor may have been invited by those of the de-

fendant. In substance, the district attorney attempted to explain that the statements in the police station are taken in haste and without all of the details being given, whereas there is plenty of time for full examination before the grand jury. In the course of his argument, he said:

"* * * the Grand Jury is composed of seven ladies and gentlemen just like you are, and the duty of a Grand Jury is to determine whether or not a crime has been committed. If there is any chance you have got the wrong party, any chance that this party should not be indicted, you always take the position that they are entitled to the benefit of that evidence, and you have time enough to proceed."

Again, he said of the grand jury:

"* * * with the benefit of all the facts, they have to say whether or not they should return an indictment. They are not going to charge anybody with murder in the first degree, lock them up in jail and put them to the expense of defending themselves, knowing that they have no chance to convict them, and that he is the wrong man."

At that juncture, the defendant objected to any comment upon what took place before the grand jury and asserted contrary to the fact that there was no evidence that Mrs. Burnside ever testified before the grand jury. The court said:

"Of course, whatever transpired before the Grand Jury here, except as it is brought into evidence in this case, is not properly in the case and should not be a matter of argument."

The defendant then moved to strike out all of the district attorney's argument with reference to the grand jury, and for a mistrial, to which the court said:

"The Court will allow the motion to strike any argument made with reference to procedure before the Grand Jury."

The motion for mistrial was denied. After the court had thus ruled, the district attorney continued as follows concerning the grand jury:

"* * * Their names and addresses are of record, the same as your names and addresses are of record as members of the jury, and as a matter of right and matter of law the defendant has a right to subpoena members of the Grand Jury to impeach—"

The defense interrupted with an objection. The court said:

"* * * I do not think that is an improper argument. Your motion will be denied."

Mr. Bain continued:

"They could have called any member to impeach any person that testified before the Grand Jury, as to whether they made that testimony. * * *"

The defense then asserted that the record shows that

"* * * this was a secret indictment * * * so this argument that we had a chance to appear before the Grand Jury is wholly immaterial and not proper at this time."

To which the court replied:

"That is not the argument that counsel made. * * *"

■ The district attorney did not, as has been claimed, proceed in defiance of the court's ruling. The portion of the argument to the effect that the grand jury is not going to indict a person "knowing that they have no chance to convict" was stricken from the record by a proper ruling of the trial court. The ensuing argument related to an entirely different matter, namely, to the fact that the defense could have called members of the grand jury to impeach "any person that testified before the Grand Jury, as to whether they made that

testimony." This, we think, was not an improper comment.

Not only did the court, in the course of the argument, strike the improper comment of the district attorney from the record, but in its instructions the court also instructed the jury as follows:

"The fact that an indictment has been found against the defendant is not evidence of the guilt of a defendant, but is merely the formal method approved by law of bringing the charge before the court and jury."

■ The rule is well established in this state that the language and conduct of counsel will justify a reversal only when connected with some judicial error on the part of the trial judge. *State v. Anderson,* 10 Or. 448; *State v. Abrams,* 11 Or. 169, 8 P. 327; *Thompson v. Purdy,* 45 Or. 197, 77 P. 113, 83 P. 139; *State v. Blodgett,* 50 Or. 329, 92 P. 820; *State v. Lem Woon,* 57 Or. 482, 107 P. 974, 112 P. 427; *State v. Wong Wen Teung,* 99 Or. 95, 195 P. 349; *Hostetler v. Eccles,* 112 Or. 572, 230 P. 549; *Kelley v. Stout Lumber Co.,* 123 Or. 647, 263 P. 881; and *Watts v. Spokane, P. & S. R. Co.,* 88 Or. 192, 171 P. 901. To this rule there may be exceptions. We have recognized that the conduct of an attorney in going outside of the record may be so reprehensible and so manifestly intended to mislead the jury as to be ground for reversal, even though the court may have attempted to correct the error. *Boyd v. Portland Electric Co.,* 37 Or. 567, 62 P. 378, 52 L. R. A. 509; *Watson v. Southern Oregon Co.,* 39 Or. 481, 65 P. 985. But this case does not fall within that exception. The record fails to disclose any reversible error in view of the action of the trial court.

■ As his tenth assignment, the defendant asserts that "the court erred in permitting reception into the

evidence of a great amount of testimony concerning the activities of one Ted Martin.'' This assignment is clearly insufficient. It sets forth no objection or motion by the defendant, and no ruling of the trial court. Furthermore, the defendant, with commendable frankness, says in his brief:

'' * * * We state very frankly to the Court that this error was participated in and encouraged by both the prosecution and the defense.

* * *

''We are at a loss to know why the witness Martin was called at all. For the defense to undertake to impeach him and to cast suspicion upon him, only served to place the defendant in the position of accusing another of the crime, without legitimate basis therefor and any normal jury would necessarily conclude such a tactic to be devious and most improper. * * *''

Ted Martin was first called as a witness by the State. He testified briefly that he had seen the defendant around the Westwood Apartments in December, 1943, and again on January 27, 1944. He was subjected to a grueling cross-examination as to his relations with Burdette Dennis and Mrs. McNallen, and his conduct before, on, and after, the date of the murder. The net result of the cross-examination was to show that he had business relations with Burdette Dennis and Mrs. McNallen concerning the sale of insurance and other matters, had been in the apartment three or four times, and, once, had been at a beer parlor with Burdette, Mrs. McNallen, and a soldier. On redirect-examination Martin testified that while in the beer parlor they were interrupted by the defendant who objected to their being there. There was nothing improper in the testimony elicited from the witness by the prosecu-

tion. The record then shows a deliberate attempt on the part of the defendant to raise a suspicion in the minds of the jury that Martin was the murderer. The defendant in his brief concedes that the evidence failed to establish any complicity on the part of Martin. It was to this matter that the district attorney referred in oral argument before this court. He said:

"* * * I want to say to all this court frankly that it is my contention and the contention of the district attorney that the defendant had a lawful trial, taking all things into consideration—the matters he brought in and otherwise—he had a fair trial, but I am frank to say that he was not fairly defended * * *.

* * *

"Now, as to the matter of being unfairly defended and where the prejudice came into the case. His defense was one of alibi. In order to make it an alibi they claimed one Ted Martin was the man and witnesses saw and mistook him for the defendant. * * * every time one of the witnesses identified the defendant, dramatically counsel would say, 'Bring in Ted Martin' four or five times. 'Did you ever see this man before' and the answer, 'Never saw him in my life.' They called Ted Martin in and exhibited him whenever any of our witnesses said they never saw him, and when they found out that Ted Martin was in Pendleton the day before and the day of the murder, then they introduced this record in here in which with the naked eye you can see that every date from January 1 to March 1 has been changed two days so as to put Ted Martin's registration in Pendleton two days from the true date, and when it was introduced with that change, you can see the prejudice that came into the case, and that is what I had in mind when I say it had something to do with the penalty the jury inflicted on him. * * *"

■ In short, the defense attempted to support the defendant's alibi by casting suspicion upon an innocent man and they now claim that the court erred in failing to act on its own motion to prevent them from seeking to secure an acquittal by means which they admit to have been improper. We can not say that in determining the penalty to be imposed upon the defendant the jury may not have been influenced by the tactics employed, but we can say that no court would be justified in reversing a conviction because the defendant tried and failed to establish an alibi and unconscionably sought to cast the blame upon another.

With the utmost care we have examined 745 pages of testimony, 260 pages of defendant's brief, and more than 240 cases cited therein. We find no reversible error. The judgment is therefore affirmed.

Mr. Justice KELLY dissents.

Petition for rehearing denied September 11, 1945

## ON PETITION FOR REHEARING
### (161 P. (2d) 670)

BRAND, J.

With full appreciation of the gravity of the issues involved, we have given careful consideration to the petition for rehearing which has been filed on behalf of the defendant by Attorneys Edwin D. Hicks and Thomas H. Tongue, III. That petition raises no issues which were not considered by the court upon the first hearing. We adhere to our original conclusion that no reversible error was committed at the trial. The petition is therefore denied.

The record will show that the attorneys who filed the petition and who have ably presented their case did not participate in the trial of the cause in the circuit court.