Argued September 8, affirmed October 6, petition for rehearing
denied November 3, 1954

# STATE OF OREGON *v.* CAPUTO

274 P. 2d 798

*David W. Dardano* and *Leo Levenson,* of Portland, argued the cause for appellant. With them on the brief was Larry Landgraver, of Portland.

*James J. Kennedy,* Deputy District Attorney for Multnomah County argued the cause for respondent. With him on the brief were John B. McCourt, District Attorney for Multnomah County, and Robert R. Carney and Horace B. Fenton, Deputy District Attorneys for Multnomah County.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

BRAND, J.

On 27 February 1953 an indictment was filed which reads as follows:

"LARRY CAPUTO is accused by the Grand Jury of the County of Multnomah and State of Oregon, by this indictment of the crime of CONTRIBUTING TO THE DELINQUENCY OF A MINOR committed as follows:

"The said LARRY CAPUTO on the 17th day of December, A. D. 1952, in the County of Multnomah and State of Oregon, then and there being, and one Lila Victor then and there being an unmarried female child under the age of eighteen (18) years, the said Larry Caputo did then and there unlawfully and feloniously do an act, to-wit: did then and there by threats, commands and persuasion induce and persuade the said Lila Victor to engage in prostitution, which course of conduct did manifestly then and there cause the said Lila Victor to become a delinquent child, * * *."

On arraignment the defendant stated his true name to be Adolph A. Caputo. He entered a plea of not guilty and upon trial by jury was convicted. Defendant moved for judgment notwithstanding the verdict and in the alternative for a new trial. Both motions were denied and defendant was sentenced to imprisonment in the penitentiary for the maximum period of two years. He appeals. The statute, for violation of which, the defendant was convicted, reads as follows:

"When a child is a delinquent child as defined by any statute of this state, any person responsible for, or by any act encouraging, causing or contributing to the delinquency of such child, or any person who by threats, command or persuasion, endeavors to induce any child to perform any act or follow any course of conduct which would cause it to become a delinquent child, or any person who does any act which manifestly tends to cause any child to become a delinquent child, shall be punished upon conviction by a fine of not more than $1,000, or by imprisonment in the county jail for a period not exceeding one year, or both, or by imprisonment in the penitentiary for a period not exceeding five years." ORS 167.210.

In the statute regulating juvenile court proceedings we find the following provision:

"(1) 'Delinquent child' includes any child under the age of 18 years who violates any law of this state or any city or village ordinance, or who is incorrigible, or who is a persistent truant from school, or who associates with criminals or reputed criminals, or vicious or immoral persons, or who is growing up in idleness or crime, or who frequents, visits, or is found in any disorderly house, bawdy house, or house of ill fame, or any house or place where fornication is enacted, or in any saloon, barroom or drinking shop or place, or any place where spirituous liquors, or wine, or intoxicating or malt

liquors are sold at retail, exchanged or given away, or who patronizes, frequents, visits or is found in any gaming house, or in any place where any gaming device is or shall be operated.

"(2) 'Child dependency,' 'dependent children' and 'neglected children,' unless otherwise required by context, have the meaning given those terms by ORS 419.102." ORS 419.502.

Assignments of error 1, 2, 3, 8, 10 and 12 raise substantially the same issues. It is argued that the court erred in refusing to direct a verdict of not guilty and in denying motions for judgment notwithstanding the verdict and for a new trial. It is contended that there was no convincing evidence that the defendant had committed the acts charged and that the evidence established nothing more than a mere suspicion of guilt. It is repeatedly argued that the prosecutrix had admitted the indiscriminate practice of intercourse with men and that because of this fact she had already become a delinquent child and a prostitute before she met the defendant. It is therefore contended that it was impossible for the defendant to have caused her to "become" what she already was. The prosecuting witness testified with extraordinary frankness concerning her conduct which proved her to have been a wild and irresponsible child before she met the defendant. She admitted sexual intercourse with several young men shortly before meeting the defendant. She had voluntarily gone to the judge of the domestic relations court and had been committed for a time to the Hillcrest school. We conclude that she was a delinquent child, 16 years of age, when she met the defendant. The evidence shows that she was driven out to the Shadows Club where the defendant was employed, by three young men, with at least two of whom she had enjoyed

sexual relations. The three boys went into the club and she stayed outside in the car. She testified that the defendant came out to the car and that they had a conversation. Concerning its substance, she testified:

"A * * * to the effect that, would I be willing to have him send gentlemen to see me for money for the purpose of prostitution, and from the conversation I am definitely sure that he knew that I had never done prostitution work for any money or for any - - - -

* * * * *

"A Well, he asked me if I would be willing to have him send gentlemen to me, or men to me, from - - I gather it was The Shadows club, because - - well, here I go trying to tell again.

"Q Go ahead.

"A (Continuing) And he told me that if I was interested that I could give him a call, and from the conversation I gathered that the fellows that I had been with that evening had suggested it to him, but the conversation just ranged around the subject that would I be willing to have him send men to me, and I hadn't quite made up my mind 'Yes' or 'No.' I mean I just hadn't made any decision, but I guess in my mind I had kind of made up my mind that I would, and he told me to call him if I did decide, and I did call him * * *

* * * * *

"Q That night when you were out in the car talking to the defendant, was anything said about money, about money again?

"A Yes; it was with the understanding that the money would pass through him, from the fellow to him, and I presume that was under the - - oh, I don't know - - under the idea that I didn't know who he was sending, and probably he wasn't too sure of the fellows he was sending, and it wasn't

too definite whether I would ever be able to keep care of the money or not.

"Q Was anything said to you as to who would pay you?

"A Yes, it was under the agreement that he would pay me.

"Q Did he say that to you?

"A Yes, he did.

"Q That night?

"A Yes.

"Q Did he say anything that night about the amount of money you would receive in connection with this type of work?

"A No. I can't say as he said any definite figures, no.

\* \* \* \* \*

"A Well, he did make a reference in the conversation about the way I was dressed, and that I was never secure in having a roof over my head, and that by earning money that I would be able to buy decent clothes, and that I would know where my next meal was coming from, and that I would have a roof over my head all the time."

The defendant Caputo as a witness admitted leaving the club and talking with the prosecuting witness but stated that he only went out to tell her that she could not come in. The prosecuting witness testified further that pursuant to the arrangement she telephoned to the defendant and he sent her a man who went with her to his apartment. She said that they did not have intercourse but that she contacted Caputo at the club and he asked her if the man had been satisfied and gave her $20. Her testimony was that before this time she was substantially without funds. She testified that she gave $10 to one Voorhees the same night at a bootleg establishment, and her testimony was confirmed in that respect by Voorhees as a wit-

ness. A few days later she again telephoned Caputo at the club and received instructions to come out, which she did. At the club she was joined by a merchant seaman. They had intercourse and the next day she returned to the Shadows Club and received $20 from Caputo. She also testified to another similar transaction and another $20 payment from the defendant. After that she started working as a paid prostitute in three places in Oregon and in Tacoma, Washington. This continued until her arrest on 17 February 1952.

Although the defendant denied that he had entered into the alleged arrangements with her, he admitted that she was in the Shadows Club four or five times.

In view of defendant's contention that the testimony raised a mere suspicion of guilt, we deem it proper to say that we think her memory of the details of her varied and frequent activities is little short of remarkable. In our opinion, the record portrays a highly irresponsible child, but an intelligent and credible witness. In any event, we are not authorized to grant a new trial for insufficiency of the evidence unless we can affirmatively say that there was no substantial evidence to support the verdict. Oregon Constitution, Article VII, section 3; *State of Oregon v. Moore,* 194 Or 232, 241 P2d 455. The defendant cites five cases concerning the necessity of cogent and convincing evidence in cases based solely on circumstantial evidence. In such cases this court recognizes its duty to consider the sufficiency of the evidence under the rules set forth in *State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670; *State v. Long,* 195 Or 81, 244 P2d 1033. This, however, was a case of direct and substantial testimony which, if believed by the jury, warranted conviction. Of course it was necessary that proof of guilt

be established beyond reasonable doubt, but the question in this case was one for the jury.

The argument of the defendant is that it was impossible to cause the prosecuting witness to "become" a delinquent child when she already was one. The argument raises questions both as to the proper construction of the statute and as to the material allegations of the indictment. The construction suggested is of the type which moved the Supreme Court of Pennsylvania to say:

> "Considering the beneficent purpose of the legislation, no court should be astute in finding reasons to relieve those who violate its provisions." *Commonwealth v. Jordan,* 136 Pa Super 242, 7 A2d 523, 528.

A similar argument was considered by the Supreme Court of Washington. An indictment charged that the defendant did "willfully * * * encourage, cause, and contribute to the delinquency" of a female child by attempting to indulge in sexual intercourse with her, the said child being "then and there a * * * delinquent person." The court said:

> "It is urged that the words 'encourage, cause, and contribute' cannot be used together in this form, since the word 'cause' must refer to those acts which bring about or are the initial cause of the delinquency, and the information charged herein that the minor was already a delinquent child.
>
>    * * * * *
>
> "We think the word 'cause' may well be used with reference to acts which bring about or assist in the continuance of a state of delinquency, as well as to refer to the acts which bring about the initial step of delinquency." *State v. Strom,* 144 Wash 334, 258 P 15.

■ To become a delinquent child is not analogous to becoming a member of a lodge or of the I.W.W. See *State v. Laundy*, 103 Or 443, 204 P 958, 206 P 290. Having joined a lodge, we suppose one could not become more a member, but one may become a more delinquent child. It is our duty to construe the statute in accordance with the provisions of ORS 161.050. Even in states unlike our own, where the rule of strict construction of all criminal statutes still applies, it is held that in cases of this kind "in arriving at a proper construction we are not required to close our eyes to the broad underlying policy and the dominant purpose of the whole law of which the section under consideration is a part. * * *" *State v. Adams*, 95 Wash 189, 163 P 403, 404. See also *State v. Dunn*, 53 Or 304, 99 P 278, 100 P 258; *Commonwealth v. Jordan*, supra.

■ The provision of ORS 167.210, supra, do not stop with the portion which makes it a crime to do an act which "would cause" or "manifestly tend" to cause a child to become delinquent. It also provides that "When a child is a delinquent child * * * any person * * * by any act * * * contributing to the delinquency * * * shall be punished. * * *" The defendant was informed by the indictment that he was charged with the crime of contributing to the delinquency of a minor and it alleges that he did induce and persuade the child to engage in prostitution. In view of the nature of the act charged we think it was unnecessary for the indictment to add that the act "caused" the child to "become" delinquent. The crime was sufficiently described when the defendant was notified that he had contributed to the child's delinquency by inducing her to engage in prostitution. We doubt if any one will have the hardihood to argue that such an act does not contribute to delinquency,

whether the child was already delinquent or for the first time became so.

Although the child had indulged in somewhat indiscriminate sexual intercourse before meeting the defendant, there is substantial evidence that she had not therefore become a prostitute for pay. In truth the jury were entitled to find that she became more delinquent by reason of the defendant's acts.

The defendant relies upon certain language found in *State v. Moore,* supra. Our discussion in that case related, not to the indictment, but to the evidence. We said:

> "* * * Of course, it is further necessary to prove that the act or acts so established manifestly tended to cause the child to become a delinquent child. In other words, it is necessary to establish by the evidence: (1) one or more of the acts of misconduct specifically alleged, and (2) that such act or acts manifestly tended to cause the child to become a delinquent child."

The case was decided upon the ground that the specific act charged against the defendant was not proven. We did not intend to intimate that there is, as it were, an open season as to any child who has once become delinquent. It is unthinkable that the legislature intended that the waywardness of the child should be a defense to a man who attempts to lead her into a life of commercialized degeneracy.

The foregoing disposes of assignments of error 1, 2, 3, 8, 10 and 12.

■ The trial court read to the jury the provisions of ORS 167.210, supra, which defines the crime of contributing to the delinquency. No error was committed thereby. Counsel has confused the act charged against the defendant with the alleged effect of the act. Upon

proof of the act here charged the jury could infer that the defendant by the act contributed to delinquency.

■ The refusal of the court to give an instruction on the burden of proof as requested by the defendant is assigned as error. The instruction given on that subject was one commonly employed by courts. The jury was informed that the plea of not guilty put in issue every material allegation of the indictment that all of the presumptions were in favor of innocence and that "defendant is presumed to be innocent until such time, if that ever arrives, when he is convicted to your satisfaction and beyond a reasonable doubt. The state must prove beyond a reasonable doubt each and every material allegation of the indictment before there can be a conviction." The assignment is without merit.

The court refused to give the following requested instruction:

"The Court instructs the jury that if from all the evidence in the case you believe beyond a reasonable doubt and to a moral certainty that the testimony of Lila Victor bears on its face indications of irresponsibility or improbability and is contradicted by other evidence then in that event I instruct you that her testimony unless corroborated is insufficient to support a conviction and in such event you must return a verdict of not guilty."

In several respects the instruction was not a correct statement of the law. No law requires the corroboration of the testimony of an irresponsible witness. The word "irresponsible" may mean "incapable of incurring responsibility. Not able to answer for consequences; unaccountable, undependable, carefree." Webster's New International Dictionary, 2d Ed. The testimony of such a witness may or may not be highly credible.

■ We find no error in the refusal of the court to give instructions referred to in assignments of error 7, 8 and 9. So far as necessary they were covered by the instructions of the court.

■ Assignment of error 11 is without merit. The prosecuting witness testified briefly in answer to a question on cross examination by the defendant concerning a conversation:

"* * * Bob Voorhees and Jim Ciotti had been kind of talking to me about it, and I guess kind of getting me prepared for what Mr. Caputo was going to say."

Defendant moved that the answer be stricken. The court said:

"* * * I will instruct the jury to disregard the conversation with Voorhees and Ciotti, not in the presence of the defendant. You will try to erase that completely from your minds and not consider it in deciding the case."

The last assignment of error covers many issues already discussed and urges upon us that the court erred in failing to grant a new trial for the reasons stated in the motion therefor. The motion states:

"* * * the defendant will show that one of the jurors sitting in the above entitled case namely Arthur Raymond Oberg was committed to the mental hospital for veterans at Roseburg, Oregon, by committment issued on February 19, 1946, being signed by the Honorable Ashby C. Dickson and being case No. 16801, Department of Probate, and was not discharged as cured by the veterans' hospital but merely 'Discharged from the Records'. That said committment was signed after a hearing of the petition of a sister of the juror and examination by two competent physicians and psychiatrists upon a finding that he was suffering from paranoic hal-

lucinations. Section 2-407 Sub-section 33 O.C.L.A. holds that a condition once shown to exist is presumed to continue until evidence to the contrary is offered.''

The alternative motion for a new trial was filed on 20 April 1953. It was denied on 22 April 1953. The motion for a new trial does not even contain an unsworn allegation that the juror had been committed seven years before. It merely states that defendant ''will show'' such event to have happened. We have searched the record in vain for any affidavit supporting the motion or purported motion. If defendant desired to raise this issue it was his duty at the least to present an affidavit setting forth the relevant facts. This he failed to do. The motion is not before us. *Karberg v. Leahy,* 144 Or 687, 26 P2d 56. Since the defendant has attempted to raise this issue we deem it proper in the interests of justice to add that the able trial judge considered the motion as if the matter were properly before him, and in denying it, expressed the opinion that the trial ''was absolutely fair'' and that the juror was sane at the time of trial.

The judgment of conviction is affirmed.