Argued November 19, affirmed December 31, 1958

# STATE OF OREGON *v.* DUGGAN

333 P. 2d 907

*Thomas W. Hansen,* Deputy District Attorney, Salem, argued the cause for respondent. With him on the brief was Hattie J. Bratzel, District Attorney, Salem.

*Charles D. Burt,* Salem, argued the cause for appellant. With him on the brief was Robin D. Day, Salem.

Before PERRY, Chief Justice, and ROSSMAN, MC-ALLISTER and O'CONNELL, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment of the circuit court, based upon a verdict, which found the defendant guilty of the crime of assault and robbery not being armed with a dangerous weapon. ORS 163.290. The defendant submits ten assignments of error, some of which are repetitive in nature. The general overtone of their contentions is a challenge to the sufficiency of the evidence to warrant a finding of guilt.

Evidence showed that November 12, 1956, at about 9:00 p. m., two men, through the use of threats, forced one Kenneth Melton, manager of a store in Salem known as Erickson's Super Market, to open the store's safe, whereupon they robbed him and the store of $9,000 consisting of money and bank checks. The state contends that the defendant was one of the two men. The defendant pleaded not guilty. One Irvin Fitzgerald, who also was charged by indictment with commission of the crime, pleaded guilty and at the time of the trial was serving a sentence of five years. He

gave testimony for the state. The defendant's brief declares:

"It is the defendant's position that the other man involved was never identified and that the transcript shows no identification of the defendant as that man."

Mention at this point of the evidence which tends to show whether or not the defendant was identified as one of the two robbers will facilitate a disposition of the assignments of error.

Kenneth Melton, aforementioned, testified that he was held up and forced to open the safe of the store by two men, one of whom he identified at Irvin Fitzgerald. He swore that the two men, after forcing him to take four to five thousand dollars in cash and four to five thousand dollars in checks from the safe, took the booty with them. The other man, according to this witness, was about six feet tall, but, since the light in the store was dim, Melton could not, so he swore, discern that individual's features except to note that "he had a hat, overcoat and glasses and a mustache."

Irvin Fitzgerald, who, the state claimed, was an unwilling witness, testified:

"Q Directing your attention back to that night of November 12th, after you left Erickson's Market with the money where did you go?
"A To Portland.
"Q How did you travel there?
"A By car.
"Q What kind of car?
"A 1950 Merc.
 * * *
"Q Do you know a person named Hazel Folsom?
"A Vaguely.

"Q Did you see her that night?
"A Yes.

"Q Where did you see her?
"A After the robbery.

"Q Pardon?
"A After the robbery.

"Q Where?
"A In Portland.

"Q Did you see her at her home?
"A Yes.

\* \* \*

"Q Did you take the money to her home?
"A Yes.

"Q Did you divide the money there?
"A Yes.

"Q Was there another person with you at Erickson's Market?
"A The man I held up.

"Q Was there another person beyond that?
"A Yes."

Fitzgerald was not asked by either the state or the defendant whether the other man with whom he robbed the store was Duggan. The state, of course, had the burden of proof. The reluctance of the state to ask the question may perhaps be explained by the following statement made by Fitzgerald, out of the presence of the jury, after he had claimed that he was testifying under duress:

"THE COURT: Would you care to explain to me what you mean by being under duress?

"A Well, I got my sentence. I got five years and I want to do my time and I got thirteen hundred prisoners I have to live with and I don't feel I should have to testify, and my parole was brought up and I don't care if they revoke my parole if I got one coming. I just want to be left alone."

Most of the cross-examination and redirect examination was directed at the contention of Fitzgerald that the deputy district attorney would speak to the parole board if the witness did not tell the truth. The state, faced with the fact that a critical witness was reluctant to testify, apparently did not wish to push him further than absolutely necessary. The defense makes no claim that Fitzgerald would have named a person other than the defendant if asked the question. In this exigency we do not think the state's failure to ask the question, though not commendable, can be condemned, for to do so would probably unduly hamper the handling of such a recalcitrant witness. It was not fatal to the case, according to our belief, for the state not to have asked Fitzgerald the crucial question, provided that some other connection of the defendant with the crime was established.

In order to determine whether or not the evidence established that the defendant participated in the commission of the alleged crime, we go to the testimony of the next witness for the state, the woman Fitzgerald admitted meeting in Portland after the robbery (Mrs. Folsom). After stating that she had known the defendant for a year, she testified that she met him on the night of the robbery in the company of Fitzgerald. The following testimony was then given:

"Q Did either Mr. Duggan, or Mr. Fitzgerald in Mr. Duggan's presence in your home that night, tell you where they had been earlier that evening?

"A They said they had been out of town, but they didn't name any specific place.

"Q Later on did they—answer yes or no—tell you where they had been?

"A Yes.

"Q Give us the location of where they told you.

"A They just said Salem.

\* \* \*

"Q At what time did they tell you where they had been?

"A It was quite a bit later.

"Q How much later?

"A I would say several hours—two or three hours later.

"Q Several hours later. Did they tell you where they had been?

"A Yes.

"Q Where was that?

"A Salem.

"Q Did they tell you what they did there?

"A Yes.

"Q What did they tell you they did?

"MR. BURT: Your Honor, I would ask who told what in this case.

"Q I will ask it this way: When you say they you mean Mr. Fitzgerald and Mr. Duggan were both in your presence at that time?

"A No.

"Q Who was talking to you?

"A Denver Duggan.

"Q What did he say?

"A I just pulled a job.

"Q Where?

"A Salem.

\* \* \*

"Q Getting back to what happened when they first came to your house, tell us what transpired.

"A Irvin Fitzgerald and Denver Duggan went straight to my place, the bathroom and shaved and cleaned up.

"Q Did they have beards?

"A He had a mustache on.

\* \* \*

"Q What else did he do?

"A Took the black off his hair and eyebrows.

\* \* \*

"Q After he did this then what happened?

"A He came out of the bathroom and said they had done it and I asked what, and he said 'Pulled a job.'

"Q And then what happened?

"A I asked where and he said, 'Don't worry about it; it is out of town.'

"Q Now, what kind of a car did Mr. Duggan own at that time?

"A Mercury.

"Q What year?

\* \* \*

"A Oh, it was probably in the '40s. I don't remember now.

\* \* \*

"Q Did you talk to them before they came to your home by phone or otherwise?

"A Yes.

"Q What was it?

"A Denver Duggan just called and asked me to come after him, that he had broken his car down.

"Q Did you go after him?

"A Yes.

\* \* \*

"Q Did you pick him up?

"A Yes.

"Q That was when you took him to your home?

"A Yes.

"Q After he came out of the bathroom when you say he cleaned up, what did he do then?

"A Well, not much of anything, I guess."

After some colloquy the state obtained permission to show the witness a paper "to refresh her memory."

She identified the paper shown to her as a statement she had made and signed in the Rocky Butte jail on January 24, 1957. She was then asked:

"Q Miss Folsom, after reading that statement are you able to testify? From your present memory now, having read this statement, do you remember what happened?

"A Yes.

\* \* \*

"Q You mentioned that Mr. Duggan went in and shaved off his mustache and cleaned the black off his eyebrows and hair, what transpired after that, if anything?

"A Well, I heard them thumbing paper in the bathroom and Irvin asked me for a couple of paper sacks and they put $1,500.00 in one paper sack and checks in another.

MR. BURT: Did you see this? Is that what you saw or what you think you heard?

"A All I seen was they brought the sacks out.

MR. BURT: You never saw what was put in the sacks?

"A No.

MR. BURT: I will ask that the last statement be stricken. It is obvious she doesn't know what was put in the sacks. She is testifying about what she heard behind closed doors.

THE COURT: Sustained.

"Q Did they tell you what they put in the sacks?
"A Yes.

"Q What did they tell you they put in the sacks?
MR. BURT: Who told you?

"Q Which one told you?
"A Denver.

"Q What did he tell you he put in the sacks?
"A He said they put $1,500.00 in one sack and checks in another sack.

"Q What happened to those checks?

"A He asked me where he could put the sack with the money in it and I told him in my attic.

"Q And did he do that?

"A Yes.

"Q What happened then, if anything?

"A Then he took the other sack and put it in the trash burner in my back yard."

Mrs. Folsom then testified that the next day she and Duggan pulled his car into the car lot of one Dick Harris. The defendant's car, according to the witness, was a Mercury "probably in the '40s" and its "rods" were burned out. Following that incident, Duggan "bought some new clothes and got a haircut," so the witness stated. That night, according to her further testimony, she and Duggan went to Tualatin where he picked up something which he put in a sack and, in the presence of the witness, carried to her house. There she saw that silver money was in the sack. She then testified:

"Q What else, if anything, did you find out there at Tualatin?

"A A plastic raincoat and gloves and glasses.

"Q State the reason why you went to this area with Mr. Duggan.

"A Because his car had broken down and he had put the money there to be picked up later."

In the remainder of her testimony she (1) described a later visit to Tualatin in the company of a police officer where they picked up more money; (2) swore that the defendant did not generally wear a mustache; and (3) related details about what Fitzgerald did after the money was divided between the two alleged joint principals.

D. M. Harris, a dealer in used cars, testified that October 16, 1956, he sold the defendant a used Mercury automobile and that on November 13, 1956, he accepted the Mercury in a transaction in which he sold the defendant a used Cadillac. The witness swore that the Mercury was a 1949 model and that its "bearings were burned out" November 13, 1956, when the transaction concerning the Cadillac occurred.

The sheriff of Marion county told of going to Salinas, California, in August, 1957, to return the defendant to Salem after California police had apprehended him. While in California the defendant used an assumed name. According to the sheriff, the defendant told him that he "was glad he had finally been picked up, he had been dodging and looking for somebody to tap him on the shoulder for some months." Other police officers described the unavailing search that had been made for the defendant in Oregon, including calls at the home where he had resided.

The foregoing is the substance of the evidence produced to connect the defendant with the robbery. The defendant did not testify and produced no witnesses.

■ The first assignment of error is based on the following question to and answer given by Melton:

"Q Was he in the lineup?
"A Yes."

This was objected to as leading and conveying the impression that the witness could identify the defendant as the man who robbed him. However, it does not stand alone in the sequence of questions, as the following also was brought out:

"Q As to Mr. Duggan, when did you see him again?
"A I don't know how long ago; about two or three weeks ago I was called to the sheriff's office.

"Q At what is commonly called a line-up?
"A Yes.

"Q Could you recognize Mr. Duggan specifically that day?

\* \* \*

"A No.

"Q And was he in the line-up? Did you pick him out of the line-up?
"A Yes.

\* \* \*

"Q Why was that?
"A Because as I remember the man, he was a big man, and that is the only thing I had to go on.

"Q That is the only—
"A (Interrupting) That is why I picked him out of the line-up.

"Q He was the tallest man in the line-up?
"A Yes.

"Q And other than that you couldn't identify him that night?
"A That is the only thing I had to go on."

And, on cross-examination, the witness stated:

"Q As I understand it, you picked Mr. Duggan, the defendant here, out of the line-up solely because he was the only tall man in that line-up?
"A Yes."

In view of the foregoing testimony, we fail to see how the jury could have been misled as to the basis on which the defendant was picked out of the line-up. The first assignment of error is without merit.

■ The second assignment of error is based on a contention that Fitzgerald was allowed to testify about a crime with which the defendant had not been connected and that admission of evidence of crimes committed by third parties, for which the defendant is not

shown to be responsible, is error. The defendant cites *State v. Fong,* 211 Or 1, 314 P2d 243. The order of proof is in the discretion of the trial court. ORS 17.215. The defendant was later connected with the crime with which he was charged; that is, the one in which Fitzgerald participated. This is not a case in which testimony was received about a crime with which the defendant was neither charged nor connected, as was true in the Fong case, where extensive testimony about the activities of a narcotics ring was put in evidence, although the defendant was not charged with anything relating directly thereto and was not even shown to know some of the persons whose activities were described by the state's witnesses. The second assignment of error is without merit.

■ Neglecting for the moment the third assignment of error, we will consider the fourth, which is based on a ruling that permitted Mrs. Folsom to refresh her memory by reading from a prior statement which she had made. Our previous quotation from Mrs. Folsom's testimony has indicated the nature of the defendant's contentions. This assignment is based on an objection that the state tried to impeach its own witness, but we fail to see any merit in that argument since no contradiction exists in her testimony. The defendant urges that such outside statements cannot be introduced in evidence, and this may be so, but no attempt to do anything of that nature was made. The witness said she was testifying from present memory. *State v. Merlo,* 92 Or 678, 173 P 317, 182 P 153, cited by the defense, contains an excellent review of the problems in this area, but the course that was taken at the trial was consistent with that case. ORS 45.580 provides:

"A witness is allowed to refresh his memory respecting a fact by anything written by himself,

or under his direction, at the time when the fact occurred or immediately thereafter or at any other time when the fact was fresh in his memory and he knew it was correctly stated in the writing; * * *."

From *Susewind v. Lever,* 37 Or 365, 61 P 644, we take the following:

"* * * It is the duty of a party to introduce the best evidence that is within his power to produce, and if he calls a witness who, after examining a memorandum made by him or under his direction, remembers the facts therein stated, the knowledge of the witness in this respect is superior to the memorandum, and better subserves the purpose of a trial, because it affords an opportunity for cross-examination, * * *."

Where nothing more is done than for a witness to remind himself of facts which he actually knows, and no attempt is made to introduce a statement made at another time, we fail to see how any contention can be made that the provisions of the above statute have been violated or in what way this defendant has been prejudiced. The fourth assignment of error is without merit.

■ We will next consider the seventh assignment of error. It is based on a contention that error was committed when an instruction on "flight" was given to the jury. The defendant argues that the record is devoid of evidence of flight. Since the defendant was located in California, using an assumed name, and was not in Portland at his reported address where his wife lived, this instruction was justified, particularly in view of the fact that the instructions in clear language told the jury to determine whether the evidence showed flight and the use by the defendant of a false name. This assignment has no merit.

■ We will now consider the third and fifth assignments of error, which are based on the alleged coercion of the witnesses Fitzgerald and Folsom. Both of those witnesses had apparently been told by the state that their failure to testify might have an adverse effect on their possible future paroles. Much of the transcript of evidence is taken up with a discussion of what promises, if any, were made, and it seems to us that the circumstances could not have escaped the understanding of the jury which was instructed that it should take into consideration in determining the credibility of the witnesses any motives they may have had. The defendant cites *Lane v. First National Bank,* 131 Or 350, 270 P 476, 281 P 172, 283 P 17, wherein the court held that a witness was not credible because of the manner in which he answered questions and his evident self-interest. Without pointing out the differences in the interest involved, we feel it is only necessary to say that that case was tried in equity and the court was reviewing a conflict in the evidence. In such a case, the question of credibility is for the court. In the instant case, the question of credibility was for the jury which tried this case.

In *Anderson ex rel Poe v. Gladden,* 205 Or 538, 288 P2d 823, where the testimony of a co-indictee was challenged on the ground that a promise of leniency had been given to him, the court said:

"* * * However, in *State v. Magone,* supra, 32 Or 206 at 210, the record showed that a co-indictee having first pleaded guilty, testified against the co-defendant on trial. On cross-examination it appeared that his testimony was given under promise of leniency. This court held that the co-indictee was a competent witness and that it was for the jury to say whether he had testified truthfully. * * * In support of the

decision in *State v. Magone,* see *Henderson v. Florida,* 135 Fla 548, 185 So 625, 120 ALR 742. An annotation to that case by the editors of American Law Reports reads, in part, as follows:

" 'In accordance with this view, the courts, both English and American, have held with substantial unanimity that a witness who is otherwise competent to testify is not rendered incompetent by the fact that he has a promise of immunity or leniency for himself.' 120 ALR 751."

In *State v. Magone,* 32 Or 206, 51 P 453, cited in the Anderson case, the witness had been promised that he would not be prosecuted, would "be out of it before very long," and stated that he would not have testified unless he had been made such promises. That promise of leniency was far stronger than any alleged promises which were made in this case. On this problem, the court said:

"* * * The interest of the witness in the result of the trial might affect his credibility, but it would not render him incompetent: Hill's Ann. Laws, § 710 [now ORS 44.020]. It is very evident from an inspection of the testimony given by the witness that he was induced by the promises held out to him to testify against the accused, but having stated the reasons that prompted him to do so, it became a question for the jury to say, from all the circumstances, whether he spoke the truth, provided his testimony was corroborated by such other evidence as tended to connect the defendant with the commission of the crime."

The reference to corroboration pertains, not to the fact that he was promised leniency, but to the fact that he was an accomplice. The jury in the present case apparently concluded that the witnesses told the truth. The third and fifth assignments of error lack merit.

■■ The eight and ninth assignments of error will

be considered together since they are almost identical. They are based upon objections to the refusal to give two requested instructions which are largely the equivalent of each other. The two requested instructions concerned the needed corroboration of accomplices. As a matter of fact, they were given for the most part in the exact language requested except the following was omitted:

"If you find that there is no corroboration of the evidence given by Irvin Fitzgerald and Helen Folsom, then I instruct you that it is your duty to find the defendant Denver R. L. Duggan, not guilty."

The sentence just quoted assumes that both witnesses were accomplices. The following was a part of each of the requested instructions:

"I instruct you in this case that the witnesses, Irvin Fitzgerald and Helen Folsom, are accomplices under our laws."

Defendant's argument in support of these exceptions contends that Irvin Fitzgerald and Hazel Folsom were accomplices. It further contends that the instructions should have defined the word "accomplice" and should have permitted the jury to determine whether Mrs. Folsom was an accomplice; in fact, the jury was so instructed. The instructions upon the law governing accomplices and their testimony was complete and well expressed. A person cannot be convicted upon the uncorroborated testimony of an accomplice (ORS 136.550). The record contains no testimony that Mrs. Folsom had any prior knowledge of this crime. Receipt of stolen property does not in itself render the receiver an accomplice even if he knew of the theft. *State v. Moxley*, 54 Or 409, 103 P 655, 20 Ann Cas 593. The instructions that were given to the jury permitted

it to determine whether or not Mrs. Folsom was an accomplice. She was not, as a matter of law, an accomplice, and since the requested instructions assumed that she was, they were properly refused. The eighth and ninth assignments of error are without merit.

We now reach the last two assignments which we will consider—the sixth which objects to the refusal to direct a verdict, and the tenth which objects to a refusal to grant a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. Both of these motions were grounded essentially on the claim that there was not sufficient evidence to support a verdict of guilty. In addition, (1) the motion for a directed verdict argued that the testimony of Fitzgerald and Folsom lacked corroboration, and (2) the motion for a judgment notwithstanding the verdict raised again the questions of bias and favors, misconduct of the deputy district attorney and a few other matters which are so lacking in merit that they will not be set forth herein.

In connection with the alleged misconduct, a hearing was held after the trial in connection with the motion for judgment notwithstanding the verdict, at the conclusion of which the trial judge found as a fact that there had been no misconduct on the part of the deputy district attorney. We have examined the transcript and find no reason whatever to question the finding.

 Upon the defendant's contentions of need for corroboration, we take the following from *State v. Long,* 113 Or 309, 231 P 963:

"* * * The jury may believe the testimony of an accomplice, but unless such testimony is corroborated by such other evidence as tends to connect the defendant with the commission of the crime, the jury is prohibited from returning a

verdict of guilty, * * *. The corroboration must go not only to the fact that a crime has been committed, but also to the fact that the prisoner was implicated in it. * * *

"Where there is some evidence other than that of the accomplice which tends to connect the defendant with the commission of a crime, the question of whether the testimony of the accomplice is so corroborated as to establish the guilt of the accused beyond a reasonable doubt is a question for the jury to determine: * * *."

With this rule in mind, we should next consider the method by which we should review the evidence to see if there was an issue to have gone to the jury. The following is taken from *State v. Rosser,* 162 Or 293, 86 P2d 441, 87 P2d 783, 91 P2d 295:

"The motion for a directed verdict presents the vital question as to whether there is any evidence, aside from that of the accomplices, tending to connect the defendant Rosser with the commission of the crime as charged in the indictment. Such motion is in the nature of a demurrer to the evidence. It admits the truth of the evidence as disclosed by the record and every reasonable inference that might be drawn therefrom. When different reasonable inferences can be drawn from the evidence, the question is one exclusively within the province of the jury. It is not the function of the court to substitute its judgment on questions of fact for that of the jury. Therefore, in considering this assignment of error, the record must be viewed in the light most favorable to the State. We are not concerned with the weight of the evidence nor with the conflict of testimony.

"Under the common law conviction may be had on the uncorroborated testimony of an accomplice, but such is not the rule in this state as the matter is controlled by statute. Section 13-935, Oregon Code 1930, * * *.

[Now, in essence, ORS 136.550 provides: "A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime, or the circumstances of the commission."]

> "The above section has been many times considered by this court. (See cases reviewed in *State v. Reynolds,* supra). We see no need for repetition. The language of the statute is so plain and unambiguous that there has been slight need for construing it. Any difficulty experienced has been not in the statement of the law but rather in its application to a particular factual situation.

> "It is well settled in this jurisdiction that, when the objection that there is no corroborative evidence tending to connect the defendant with the commission of the crime is made, the legality of the verdict must be tested in the light of the strongest statement of the case against the defendant that can reasonably be made from the evidence: *State v. Reynolds,* supra; *State v. Young,* 140 Or 228, 13 P (2d) 604; *State v. Brazell,* 126 Or 579, 269 P 884. It is not necessary that the corroborative evidence be direct and positive. It may be circumstantial in character: *State v. Brazell,* supra; *People v. Mayhew,* 150 N. Y. 346, 44 N.E. 971. All the statute requires is that, in addition to the testimony of the accomplice or accomplices, there be some evidence, however slight, tending to connect the defendant with the commission of the crime."

We are unable, as is obvious from the foregoing recital of the testimony, to say that there is no evidence tending to corroborate the testimony of the accomplice or accomplices. Therefore, there is no merit in this basis of the motion for a directed verdict.

This brings us to the final problem, the general sufficiency of the evidence to support the ver-

dict, raised in both the motion for a directed verdict and in the motion for a judgment notwithstanding the verdict and for a new trial. Since there was no eyewitness to the robbery who identified the defendant, the case of the state rests largely on circumstantial evidence. However, this in itself is not determinative of the question, since such evidence may be sufficient to support a verdict and in fact, under our constitution, we may not set aside the decision of the jury where it hinges on a question of fact, such as whether the defendant did commit the acts charged, unless we can affirmatively say there was no evidence to support the verdict. Oregon Constitution, Art VII, § 3; *State v. Caputo,* 202 Or 456, 274 P2d 798.

To set out the rules regarding circumstantial evidence and the function of this court in reviewing it, we can do no better than to quote the words of Justice BRAND in *State v. Dennis,* 177 Or 73, 159 P2d 838, 161 P2d 670, where he said:

"* * * The direct evidence of eyewitnesses is not necessary for conviction. The fact that a crime has been committed (the corpus delicti), and that it was done by the defendant, may be lawfully established by circumstantial evidence alone. But such evidence must be satisfactory. Mere suspicion, or mere probability of guilt, is insufficient. The evidence must be of the most cogent and convincing nature. Each fact necessary to establish guilt must be proved to the satisfaction of the jury and beyond reasonable doubt. The evidence upon which the State relies for conviction must not merely coincide with, render probable, and be consistent with, the guilt of the accused, but it must be inconsistent with any reasonable theory of his innocence and incapable of explanation upon any other rational hypothesis than that of guilt. [citations] If, under these rules, facts and circumstances are proven which satisfy the

jury of the truth of each and every one of the material elements of the charge, beyond a reasonable doubt, a verdict of guilty would be warranted. This does not mean that all of the testimony must be consistent with the guilt of the defendant. The testimony may be conflicting, yet the facts proved may warrant a verdict of guilty upon circumstantial evidence alone.

"The question before this court, however, is not the same as that which was before the jury. We are not directly concerned with the weight of the evidence, nor with the conflicts in the testimony, nor with the credibility of the witnesses. It is our duty to determine if there was sufficient circumstantial evidence of guilt from which the jury, in the performance of its function as triers of the fact, could properly find a verdict of guilty. [citations] We weigh and examine the evidence only to the extent necessary for the performance of this duty."

■ We have already set forth the major part of the testimony tending to connect the defendant with the crime with which he was charged. No other reasonable explanation has been offered by the defendant either here, or, as far as the record shows, at the trial, though he did suggest on oral argument that the defendant might have committed another robbery in Salem on the evening of November 12, 1956. We do not think the testimony is consistent with such a theory. The jury was properly and clearly instructed by the judge as to the way they should treat the circumstantial evidence, and there is sufficient evidence to support their verdict. The sixth and tenth assignments of error are without merit.

We have found no error. The challenged judgment is affirmed.