# STATE OF OREGON, *Respondent,*
## *v.*
# THOMAS JUDE CURRAN, *Appellant.*
## (No. 77-03-03718, CA 10101)
590 P2d 268

Wm. H. Poole, Gresham, argued the cause for appellant. With him on the brief was Poole & Bartels, Gresham.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter H. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

Thornton, J., dissenting opinion.

## TANZER, J.

Defendant appeals from his conviction of conspiracy to murder. *See* ORS 161.450. First he contends that his motion for judgment of acquittal should have been granted because there was insufficient corroboration of accomplice testimony to support a verdict of guilty.

### SUFFICIENCY OF CORROBORATION OF ACCOMPLICE TESTIMONY

The thrust of the state's case is that the defendant conspired with Linda Olsen to murder her husband, Philip Olsen, and that defendant participated by arranging for the employment by Linda Olsen of a hired killer, Buddy Moore. Linda Olsen testified as to her conspiracy with the defendant. We shall first set out the thrust of her testimony and then examine the corroborating evidence for sufficiency.

### Linda Olsen's Testimony

Linda Olsen testified that the Olsens own and operate a business for which she is the bookkeeper. Defendant had been employed as their attorney, but the relationship had recently soured because defendant insisted that Olsen pay him a disputed wagering debt.

In February, 1977, Philip Olsen beat Linda Olsen, breaking her jaw, after she learned of an affair he had with his receptionist. Her husband's mechanic, with whom she was having an affair, suggested that the defendant might help her find someone to have her husband beaten or killed. When she called the defendant to ask for "a phone number," she assumed that the defendant would think she wanted it so that she could have something done to her husband's receptionist and the receptionist's husband. Philip Olsen had earlier asked defendant to put him in touch with a killer for that purpose. Defendant gave her Buddy Moore's name and telephone number and told her not to call him immediately because defendant wished to talk to him first. Thereafter defendant called Linda Olsen

and told her that he had talked to Buddy Moore and advised him that he should do whatever Linda Olsen wanted him to do. She then called Moore and they later met. Moore told her that when he had gone to see the defendant, defendant's first question was "is it her old man?" Moore added "Tom Curran isn't as dumb as you think he is." Moore and Linda Olsen then discussed the murder of Philip Olsen, for which Moore was to receive $5,000, half of it in advance.

Thereafter, Linda Olsen, having taken a self-development course, had a change of heart. She and her husband contacted the sheriff's office which commenced an investigation. She agreed to make telephone calls to Moore, Tucker and the defendant in order to permit the police to overhear and tape the conversations. She also arranged a meeting with Moore which the police were able to observe.

■ It is clear that the testimony of Linda Olsen, if believed, is sufficient to establish that she, the defendant and Buddy Moore conspired to murder Philip Olsen. Stated otherwise, the testimony is sufficient to establish that she, Moore and the defendant were accomplices. ORS 136.440(2), 161.155(2)(a) and (b). Next we consider whether her accomplice testimony was sufficiently corroborated.

### Corroborative Evidence

■■ The controlling statute is ORS 136.440(1), which provides:

> "A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

This statute has been repeatedly construed and applied to mean that the corroborating evidence may be circumstantial in nature, that the corroboration need not be adequate by itself to support a conviction, and that the corroboration is sufficient if it constitutes

"some evidence, however slight, tending to connect the defendant to the commission of the offense." *State v. Schoen,* 34 Or App 105, 110-11, 578 P2d 420 (1978); *State v. Pfeiffer,* 25 Or App 45, 540 P2d 174 *rev den* (1976); *State v. Duncan,* 248 Or 288, 290, 434 P2d 336 (1967); *State v. Caldwell,* 241 Or 355, 360-61, 405 P2d 847 (1965). In particular, convictions have been upheld based upon accomplice testimony corroborated by statements of the defendant. *State v. Howard,* 214 Or 611, 617, 331 P2d 1116 (1958); *State v. Rathie,* 101 Or 339, 354, 199 P 169 (1921). We now set out the corroborative testimony and evaluate it in light of the statutory standard and case law.

Philip Olsen testified that shortly before the events described above, he suspected two employees of breaking into his business and setting it afire. Because he was unable to get action from the fire marshal, he turned to defendant. He testified:

"A    I called Mr. Curran, and I said, 'Tom,' I says, 'can you have people eliminated?' He says, 'Just a minute, let me get to another phone.'

"He went to another phone, and he picked it up, and he says, 'What was that, again?' And I told him. He says, 'No problem.'

"Q    What did you say next?

"A    I said, 'Um.' I couldn't really—I always thought it was kind of a joke, from what I heard in the past, but I realized that the guy was for real.

"Q    Was there any further statement by Mr. Curran regarding the next step—

"A    No.

"Q    —to comply with your request?

"A    No.

"Q    When did you next talk to him, if you did, regarding your request?

"A    I talked to him—I believe he called the office the following week, Monday or Tuesday, but I am not sure about that.

"Q    What was the substance of that conversation?

"A    He asked me what was going on, and I told him that the Police Department was taking care of the situation."

From this testimony of Philip Olsen, the jury was entitled to infer that the defendant was willing and able to arrange for a killer.

The next piece of corroborative evidence is a tape recorded telephone call. After Linda Olsen went to the police, they tape recorded her telephone conversation with defendant:

"Def: Hello.

"L.O.: Hi, Tom?

"Def: Yeah.

"L.O.: This is Linda.

"Def: Hi.

"L.O.: Hi. What the hell is Tucker telling you?

"Def: Naakaaa, don't worry about it.

"L.O.: Oh, sheee, he gets all shook up and he starts blowing hot air and then he is gonna blow the whole thing up.

"Def: Oh, don't worry about it. Why don't you just leave the guy:

"L.O.: Hey, because. There's more involved in it than, you know, than you know or even Tucker knows. Anyway, what I called you for, you know Buddy, is, I mean, is he okay?

"Def: Yeah.

"L.O.: Before I go on with this thing, I mean, is Buddy, uh, you know, I mean is he a real flake, or . . .?

"Def: I don't know, uh . . .

"L.O.: Well, he's not going to blow the whistle?

"Def: No way.

"L.O.: Or he's not going to do nothing to, you know, he's not stupid, is he?

"Def: No.

"L.O.: 'Cause I don't, you know, I don't want to get caught and—

"Def: What you talkin' about. Why don't you come down to the office the first of the week and make an appointment.

"L.O.: Okay.

"Def: You might bring in that check, too.

"L.O.: Oh, well, I've already sent that.

"Def: Oh, did you? Good girl.

"L.O.:  Yeah. So, you know, I'm just, I just don't, you know, uh, well, I'm supposed to see Buddy today, you know.

"Def:  Well, go on your own judgment.

"L.O.:  Yeah.

"Def:  But, uh, why don't you come in the first of the week anyway—

"L.O.:  Okay.

"Def:  But I still think a good divorce would do more good, with a restraining order.

"L.O.:  Yeah, well, what good's a restraining order if he comes around and beats me up again?

"Def:  Okay. I'll talk to you the first of the week.

"L.O.:  Okay.

"Def:  'Bye now"

From this conversation, the jury could infer that defendant knew that Linda Olsen was soon to meet with Buddy Moore and that he, defendant, willingly vouched for Buddy Moore's reliability. From the comments about a divorce, the jury could infer the defendant's knowledge that Philip Olsen was the intended subject of the arrangements between Linda Olsen and Buddy Moore and, further, that the action to be arranged was something more effective than legal restraint.

The third piece of corroborative evidence resulted from a meeting between Linda Olsen and Buddy Moore on the evening of the telephone call. Linda Olsen took a room at the Portland Motor Hotel and called Buddy Moore, arranging to meet him in the bar. The meeting was observed by detectives who testified. At the meeting, Moore motioned to two men, gave them the key to Linda Olsen's room, and told them to "check it out." Linda Olsen gave Moore, pursuant to their earlier conversations, a photograph of Mr. Olsen, a written description of him and his automobile, and a down payment of $1,250, all of which was recovered from Moore's person when he was later arrested. Meanwhile, the two men who were with Moore were

apprehended by the police in the course of searching Linda Olsen's room. They were armed with pistols.

Although the evidence of the transaction between Linda Olsen and Buddy Moore did not contain an express agreement to kill for monetary consideration, the facts are sufficient circumstantial evidence to allow the inference and that the man obtained by defendant was ready, willing and able to kill for hire.

Finally, the police questioned defendant later that evening. He acknowledged that he was well acquainted with the Olsens, Tucker and Moore as clients.

In sum, the accomplice, Linda Olsen, testified that she planned to murder her husband and that the defendant aided and abetted her by procuring for her a killer for hire. From evidence other than her testimony, the jury was entitled to infer that recently before this transaction, the defendant was willing and able to procure a killer for hire for Philip Olsen, that he vouched for Buddy Moore to perform some drastic acts against Philip Olsen, and that Buddy Moore was actually a killer available to Linda Olsen upon payment of money. The independent evidence, although not prima facie evidence of all elements of the crime, is sufficient to satisfy the statutory test in that it tends to connect the defendant with the crime. Accordingly, the state's case composed of Linda Olsen's testimony and the independent evidence was sufficient to go to the jury and the motion for judgment of acquittal was properly denied.

■ ■ Defendant next assigns as error the denial of his motion for judgment of acquittal on the ground that evidence of the statements of conspirators had been admitted prior to the admission of evidence of the conspiracy in furtherance of which the statements were purportedly made. It was essentially a deferred objection to evidence. We note at the outset that questions, objections, rulings and answers are not set

out under assignments of error as required by Rule 7.19 and Appendix D of this court and we are not disposed to search the record for them. Defendant relies upon ORS 41.900(6), which provides:

"Evidence may be given of the following facts:

"* * * * *

"(6) After proof of a conspiracy, the declaration or act of a conspirator against his coconspirator, and relating to the conspiracy."

Nevertheless, we note that the testimony of Linda Olsen is sufficient to establish the existence of a conspiracy of which defendant is a part and therefore the evidentiary predicate of ORS 41.900(6) was established. The timing of the evidence is of no concern on appeal because the order of proof is within the discretion of the trial court, cf. State v. Duggan, 215 Or 151, 162-63, 333 P2d 907 (1958), and defendant points to no prejudice which may have resulted from the exercise of that discretion. We find no error in this regard.

Affirmed.

**THORNTON, J.,** dissenting.

Contrary to the majority, my conclusion after studying the record is that the state's evidence, when tested as required by ORS 136.440(1), quoted below, is not sufficient to connect defendant with the alleged conspiracy, much less establish that

"[d]efendant * * * did * * * agree with Linda Olsen, Kenneth Arlen Moore and Thomas Peter Tucker to cause the death of * * * Philip Olsen,"

as charged in the indictment.

ORS 136.440(1) provides:

"A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence that tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense or the circumstances of the commission."

[ 359 ]

In *State v. Brake,* 99 Or 310, 314, 195 P 583 (1921), the Oregon Supreme Court spelled out the basic standards for judging the sufficiency of evidence offered as independent corroboration of a defendant's involvement in a conspiracy: "The corroborative evidence must of its own force, independently of the accomplice testimony, tend to connect the defendant with the commission of the crime."

Such evidence can be entirely circumstantial, and need not be sufficient for proof of every element of the crime. However,

> " '* * * evidence which merely raises a suspicion that defendant is the guilty party is not sufficiently corroborative of the testimony of an accomplice to warrant a conviction, nor will uncertain or equivocal corroboration suffice.' 16 C.J.S., Criminal Law 712, § 1457."

*State v. Reynolds,* 160 Or 445, 458-59, 86 P2d 413 (1939).

The majority opinion maintains that the following three items of evidence are sufficient to provide the required 'independent corroboration' of Mrs. Olsen's claim that defendant was a coconspirator in the alleged plot to kill her husband:

First, Mrs. Olsen's telephone conversation with defendant which was instigated and tape-recorded by the police. This conversation is set out in full in the majority opinion;

Second, her husband's testimony that he had a telephone conversation with defendant on an earlier and unrelated occasion about whether defendant could arrange to have two other people "eliminated" whom he suspected of setting fire to his office; and

Third, the final incident in the alleged conspiracy when Mrs. Olsen met with Buddy Moore at the Portland Motor Hotel and pretended to seal the transaction with Moore and paid him the money.

As to the first item, the telephone conversation between Linda Olsen and defendant is too vague,

ambiguous and indefinite to meet the test applied in *Brake* and *Reynolds.* The alternatives to divorce or desertion of Mrs. Olsen's husband are not specified. The defendant tells Mrs. Olsen to use her own judgment in seeing Buddy Moore, and does not hint at the subject of the meeting.

As to the second item, Philip Olsen's testimony that defendant said he could have people eliminated is insufficiently related to the conversation just mentioned above to raise more than a suspicion that defendant and Mrs. Olsen may have been discussing the elimination of Philip Olsen in the taped conversation. Furthermore, Mrs. Olsen testified on cross-examination that she had never told defendant that she wanted her husband killed. The only evidence tending to show that defendant may have known of this wish was her testimony that Buddy Moore told her that defendant had guessed that this was her intention. This was hearsay twice removed. The state did not call Moore as a witness.

As to the third item, this is the weakest reed of all. While this testimony tends to corroborate the existence of the alleged conspiracy, there is simply nothing in this motel transaction linking defendant to the conspiracy.

In summary, given the provisions of ORS 136.440(1) and the paucity of the corroborative evidence, I cannot join in affirming this conviction.